RYNE, Exr., Appellee,

v.

GARVEY, Appellant.

[Cite as *Ryne v. Garvey* (1993), 87 Ohio App.3d 145.]

Court of Appeals of Ohio,
Montgomery County.

No. CA 13650.

Decided April 9, 1993.

*John Holschuh,* for appellee.

*Jacobson, Maynard, Tuschman & Kalur, Daniel S. Cody* and *Kevin M. Norchi,* for appellant.

---

Fᴀɪɴ, Judge.

Defendant-appellant John Garvey, M.D., appeals from a medical malpractice judgment rendered against him in connection with the death of plaintiff-appellee's decedent George W. Ryne. A jury found Ryne twenty-five percent negligent. The judgment recovered against Garvey was for $120,000 in compensatory damages, $3,251.68 in funeral expenses, and court costs.

Garvey contends that the trial court should have granted his motion for judgment notwithstanding the verdict. We conclude that the trial court properly overruled the motion.

## I

Ryne went to see his family doctor, William A. Erwin, on April 25, 1989, complaining of various pains in his chest and legs. Erwin performed an electrocardiogram ("EKG") and noticed changes from a previous EKG. Erwin requested Ryne to undergo further testing but Ryne refused hospital admission. Erwin then referred Ryne to Garvey, who examined Ryne the next day at the hospital's emergency room. Garvey produced a written provisional diagnosis of "viral pleuritis."

At the emergency room examination, Garvey took Ryne's medical history. In his deposition, Garvey read from his notes that Ryne had "a five-day history of aching in chest and legs and fever and chills. Some pleuritic pain. No history of chest pain or—no history of chest pain on exertion or congestive changes—congestive signs. On no meds."

Garvey then ordered a chest x-ray, performed another EKG, and had Ryne submit blood for testing. Garvey claimed to have discussed with Ryne the possibility that Ryne had atherosclerotic disease, but Garvey did not produce a written medical record to that effect.

Garvey claims to have suspected that Ryne's symptoms were due to arterial blockage, but denied in his deposition that he suspected Ryne's symptoms were caused by a heart attack:

"Q. * * * Did you consider the possibility of recent myocardial infarction?

"A. No.

"Q. Why not?

"A. It is not there.

"Q. Why is it not there?

"A. There is no EKG evidence of infarction."

In the same deposition, Garvey said that he had discussed with Ryne, in the ER (emergency room), the possibility that Ryne may have suffered a heart attack. Garvey also claimed to have recommended that Ryne undergo cardiac catheterization. Once again, Garvey failed to make a written medical record documenting his heart attack discussion with, or his treatment recommendations to, his patient Ryne.

Garvey also claimed that he suggested hospitalization for Ryne at the conclusion of the examination at the emergency room, and that Ryne refused. Nowhere in the discharge report is there any indication that Garvey suggested hospitalization to Ryne.

Ryne allegedly refused to be admitted before leaving the emergency room. Garvey's written instructions to Ryne were to come see Garvey in his office for a follow-up.

The follow-up examination was held at Garvey's office eight days after Ryne's emergency room visit. Garvey took another medical history, noting no signs of arrhythmia or congestive heart failure. Allegedly, he again urged Ryne to enter the hospital and again Ryne refused. Garvey then had Ryne sign a consent form for the treadmill test. Garvey testified at a deposition that he hoped a poor result would convince Ryne that hospitalization was necessary.

Garvey set the treadmill at 1.7 miles per hour at a ten-degree incline for two minutes. Ryne's heart rate and blood pressure were being monitored, and Ryne walked for two minutes. After one minute, Ryne's heart rate climbed from eighty-four to one hundred twenty-nine beats per minute, and then jumped to one hundred fifty-three beats per minute before the test ended.

Ryne, short of breath, sat down as Garvey told him the results of the test, and about six minutes after the test was over, Ryne fell over. CPR administered by Garvey and his nurse was unsuccessful.

An autopsy revealed a tear in Ryne's left ventricle at a spot where the heart muscle had died from a recent heart attack. Blood pumping from the tear collected in the pericardium, eventually preventing the heart from beating, causing Ryne to die from cardiac tamponade.

Ryne's expert, Eli M. Roth, M.D., testified that Garvey's treatment fell below the standard of care for physicians:

"Q. Doctor, was it within the standard of care for a cardiologist to place George Ryne on a treadmill, stress his heart on May 4th, 1992?

"A.    With the diagnosis of myocardial infarction, recent myocardial infarction, it's not within the standard of care to place him on the treadmill.

"Q.    Why?

"A.    The other thing is that when you do have a patient after the heart attack on the treadmill you do what's called a limited or submaximal stress test, meaning you don't take them up where you normally would.   You're limited by symptoms, chest pain, EKG changes to a heart rate of about 130.   You don't really want to take that heart rate over 130.

"Q.    Taking the heart rate from 84 to 153, blood pressure from 130 over 90 to more than 200 over 120, is that considered a submaximal?

"A.    No, it's not.

"Q.    What would that be considered?

"A.    That would be considered essentially a full stress test.

"Q.    Is that acceptable for a patient whose ten days post-heart attack?

"A.    No.

" * * *

"Q.    Dr. Roth. . . .    Do you have an opinion based on a reasonable medical probability as to whether ... Dr. John Garvey complied with the accepted standard of care of a reasonably competent practitioner acting under the same or similar circumstances in his care and treatment of George Ryne?   Do you have such an opinion?

"A.    Yes, I do.

"Q.    What is that opinion?

"A.    I think the standard of care was below accepted standards.

"Q.    All right, and in what regard, Doctor, do you believe Dr. Garvey fell or deviated from the standard of care, practiced beneath the standard in the treatment of George Ryne?

"A.    I think probably three areas.   Number one, the initial diagnosis.   I think with the history, the changes on the EKG, the blood tests that the diagnosis of coronary artery disease, acute myocardial infarction or recent myocardial infarction should have been entertained or made.   Assuming that it was considered, it should have been documented, and it was not.   If it was considered and the patient still refused admission, then the patient should have been given some instructions or follow-up.   Assuming that all of those things were done, it would have been inappropriate to put the patient on the treadmill when he returned to the office."

Roth also testified that Garvey's treatment proximately caused Ryne's death:

"Q. Do you have an opinion based on a probability, more likely than not, whether his heart would have ruptured had Dr. Garvey complied with the standard of care in treating George Ryne?

"A. The probability was that it would not rupture."

Finally, Roth testified to Ryne's life expectancy:

"Q. Do you have an opinion based on a reasonable medical certainty as to his life expectancy had, again, the standard of care been complied with by Dr. Garvey in this case?

"A. Again, it's a difficult question to answer, but I would say in general that his life expectancy would probably be somewhere in the six-to-ten-year range, and considering the heart attack, you may take off one or two years from that. So somewhere in the four-to-eight-year range.

"  *  *  *  *

"Q. * * * Do you have an opinion based upon a reasonable medical certainty as to what his quality of life would have been for the next-through the years following the heart attack, as you have just told us, six-to-ten years? Do you have an opinion?

"  *  *  *  *

"A. Based on the information available, Mr. Ryne was previously in good health. It seemed like they were—he was not having any real problems at that time. The heart attack would have slowed him down for a little while during the healing process, but, as I said, it did not appear that it affected the heart function that much, and I would assume that he would return to near his pre-heart attack baseline back where he was. So it should have been a good quality."

At trial, Garvey's motion for a directed verdict was overruled. The jury, in returning a general verdict for Ryne, answered a set of interrogatories, finding that (1) Garvey was negligent; (2) Garvey's negligence was a proximate cause of Ryne's death; (3) Ryne's estate suffered compensatory damages in the amount of $160,000, and $4,335.57 in funeral expenses; (4) Ryne was negligent; (5) Ryne's negligence was a proximate cause of his death; and (6) negligence attributable to Ryne was twenty-five percent. The jury provided a written description of how Garvey was negligent:

"4/26/89—ER—St Eliz Hosp. (1) Failed to document diagnosis of possible M.I. (2) Only written diagnosis was "[p]leurisy" without noting possible cardiovascular [c]omplications. (3) Did not document proper medical instructions to patient (with possible M.I.) for release from E.R. exam 4/26/89. (4) Did not document

refusal of patient for hospitalization on 4/26/89. (over) [u]se of treadmill, inducing excessive stress on patient recovering with possible recent M.I."

. Garvey then moved for a judgment notwithstanding the verdict, arguing that Ryne had failed to prove proximate cause, that Garvey could not reasonably have foreseen Ryne's cardiac rupture and that Ryne failed to prove damages. The trial court overruled Garvey's motion.

From the judgment of the trial court, Garvey appeals.

## II

Garvey's First Assignment of Error is as follows:

"The trial court erred when it denied defendant's motion for judgment notwithstanding the verdict. Plaintiff failed to establish each and every element of his wrongful death claim."

On a motion for judgment notwithstanding the verdict, the test is the same as for a directed verdict: the evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in the nonmoving party's favor; where there is substantial evidence supporting the nonmovant's case, on which reasonable minds may reach different conclusions, the motion must be denied; and the trial court, when ruling on a motion for directed verdict or a judgment notwithstanding the verdict, is not to weigh the evidence or the credibility of the witnesses. *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 28 OBR 410, 412, 504 N.E.2d 19, 21.

To maintain a wrongful death action on a theory of negligence, a plaintiff must generally show (1) the existence of a duty owed to plaintiff's decedent, (2) a breach of that duty, and (3) proximate cause. *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 529 N.E.2d 449. The plaintiff must prove that defendant's negligence, *in probability*, proximately caused the death. *Cooper v. Sisters of Charity, Inc.* (1971), 27 Ohio St.2d 242, 56 O.O.2d 146, 272 N.E.2d 97.

Proximate cause is a happening or event which as a natural and continuous sequence produces an injury without which the result would not have occurred. *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 575 N.E.2d 828.

Garvey argues that Ryne failed to establish a *prima facie* case of wrongful death—specifically, that the testimony of Ryne's expert witness, Roth, failed to establish *to a probability* that Garvey's negligence was the proximate cause of Ryne's death. Garvey points to the following testimony from cross-

examination as proof that Roth's earlier probability testimony did not meet the probability standard in *Cooper* and was instead merely speculation:

"Q.  But as to Mr. Ryne, even if Mr. Ryne had been treated in the manner you suggest, in the manner that you believe is consistent with acceptable standards of care, you cannot say that he would not have ruptured his left ventricle on May 4th or 5th even, isn't that fair, because that would require speculation on your part?

"A.  That's correct.  That would be speculation.

"Q.  And you can't say, Doctor, to a reasonable degree of medical probability—this is another statement I believe you made, but you can't say to a reasonable degree of probability that if the patient had been given aspirin or nitroglycerin that those in and of themselves would have prevented cardiac rupture in this case, correct, because that would require speculation also?

"A.  There's speculation involved in that statement also."

Garvey also argues that Roth's use of the phrase "it's impossible to say" during direct examination, concerning the probability that Garvey's alleged negligence amounted to proximate cause, also falls short of the *Cooper* probability standard:

"Q.  Doctor, in your opinion, based on a reasonable medical probability, do you have an opinion as to whether George Ryne's heart would have ruptured if the standard of care had been complied with by Dr. Garvey in this case?

"A.  Obviously, it's impossible to say, but, in all, statistically it would have been less likely to rupture.  I believe the rupture was related to the fact that the patient had damage to the heart, his activity was not limited for those week or ten days after the damage, and then he was placed on the treadmill where the blood pressure and heart rate went to excessive numbers.

"GARVEY'S ATTORNEY: Objection your Honor.  We move to strike the answer.

"THE COURT:  Overruled."

Roth's uses of "impossible" and "speculation" must be construed most strongly in favor of the nonmovant when the trial court considers a motion for judgment notwithstanding the verdict.  The jury returned a verdict in favor of Ryne's survivors after it weighed Roth's credibility and the evidence presented, and after hearing Roth testify, several times, that Garvey's failure to practice medicine up to the standard of care was probably a proximate cause of Ryne's injury and resulting death.

The trial judge agreed, holding that "the Court does not find the statements of Dr. Roth on cross-examination to necessarily conflict with his earlier testimony on the proximate cause of * * * [Ryne's] death.  Moreover, even if a conflict

were perceived, there is no resolution in favor of Defendant." We agree with the trial court's analysis and decision.

We also note that expert testimony is speculative by nature, and that an expert may concede that "it is impossible to say" and nevertheless give a professional opinion that rises to the level of probability regarding proximate cause. Were the law in Ohio to require one-hundred-percent certainty from medical expert testimony, it is doubtful that a patient could ever recover upon a theory of medical malpractice, no matter how egregious his physician's conduct. Ohio courts have approved a more-than-fifty-percent-probability standard for proving proximate cause in medical malpractice suits as the prudent rule. See *Cooper, supra.*

There was clear testimony from Roth regarding the probability that Garvey proximately caused Ryne's death. The jury believed Roth. The trial court properly reviewed Roth's testimony and rejected the same argument Garvey makes here.

Garvey's First Assignment of Error is overruled.

### III

Garvey's Second Assignment of Error is as follows:

"The trial court erred when it denied defendant's motion for judgment notwithstanding the verdict since the injury to plaintiff's decedent was not reasonably foreseeable."

Garvey argues that the existence of the doctor's duty to Ryne depended upon the foreseeability of Ryne's injury, and that because Ryne's injury was rare it was unforeseeable and, therefore, Garvey had no duty towards Ryne when he conducted the treadmill stress test. Garvey also argues that "Garvey could not have proximately caused decedent's death because he could not have foreseen the consequences of his alleged negligence act," and urges that proximate cause is equivalent to foreseeability in medical malpractice actions, citing *Jeffers v. Olexo* (1989), 43 Ohio St.3d 140, 539 N.E.2d 614.[1]

Garvey misapprehends the role of foreseeability in the determination of a physician's duty and standard of care and misstates the nature of the expert testimony Ryne produced at trial. Foreseeability is not determinative of a

---

1. In *Olexo,* a youth found helium tanks left over from a county fair and died after inhaling some of the gas. The Ohio Supreme Court found that the decedent was not an intended user of the helium and did not use the helium in an intended manner and, in holding that summary judgment was appropriate for the helium distributor, stated that "we must equate foreseeability with the proximate cause of the decedent's death." *Olexo, supra,* at 144, 539 N.E.2d at 618.

physician's legal duties. In medical malpractice cases, the existence of a duty depends upon whether there is a physician-patient relationship; physicians are said to owe patients a legal duty to use recognized standards of professional knowledge and skill. *Swankowski v. Diethelm* (1955), 98 Ohio App. 271, 57 O.O. 312, 129 N.E.2d 182. A plaintiff must show that the physician failed to act in accordance with established norms by any act or omission violating the duty of care. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673.

Garvey argued at trial that Ryne's death was not a reasonably foreseeable consequence of the treadmill stress test. As we construe Roth's testimony, Ryne's death had its origin in Garvey's failure to diagnose that Garvey had recently had a heart attack. Roth testified that Garvey's failure to diagnose the recent heart attack was below the standard of care for a physician. The jury specifically agreed with Roth's conclusion in its answer to a jury interrogatory. Roth also testified that the reason why ruptures of the heart so rarely result from a treadmill stress test is that physicians do not prescribe treadmill stress tests for recent heart attack victims. It would seem self-evident, and well within the ability of a jury reasonably to infer, that death due to the inappropriate prescription of treatments or diagnostic procedures would be likely to result from a negligent failure to diagnose that a patient has recently had a heart attack.

When a jury has found that a physician breached the duty of care by misdiagnosing a patient whose subsequent injury was proximately caused by the physician's use of diagnostic techniques that would have been contraindicated under a correct diagnosis, we will not reverse the trial court's denial of the physician's motion for judgment notwithstanding the verdict, provided that there is sufficient evidence to support the jury's findings when the record is construed in a light most favorable to the patient.

Garvey's Second Assignment of Error is overruled.

## IV

Garvey's Third Assignment of Error is as follows:

"The trial court erred when it determined that plaintiff provided sufficient evidence for an award of future damages that were reasonably certain to occur."

Garvey characterizes Ryne's proof of damages as pure speculation and argues that Ryne failed to establish future damages in terms of life expectancy with requisite certainty. We disagree.

Ohio allows "recovery for future damages that are 'reasonably certain' to result from injury." *Powell v. Montgomery* (1971), 27 Ohio App.2d 112, 116, 56 O.O.2d 279, 282, 272 N.E.2d 906, 910. Damages flowing from a life

shortened by a physician's negligence are compensable. *Miller v. Marrocco* (1991), 63 Ohio App.3d 293, 297, 578 N.E.2d 834, 837.

In the case before us, the trial court found that:

"Plaintiff provided sufficient evidence of decedent's life expectancy had he received proper care. Furthermore, Plaintiff having presented substantial evidence of the causal connection between Defendant's negligence and the death of George W. Ryne, the certainty of damage to the decedent is somewhat obvious. Any deeper examination of the Plaintiff's case concerning the matter would require the court to weigh the evidence and scrutinize the amount of damage decedent suffered."

■ R.C. 2125.02 accords juries wide discretion in awarding damages for wrongful death, and the statute no longer confines damages to the pecuniary injury sustained by the beneficiaries of the action. R.C. 2125.02(A)(3)(b)(i) and (B) provide, in pertinent part:

"In determining the amount of damages to be awarded, the jury or the court may consider all factors existing at the time of the decedent's death that are relevant to a determination of the damages suffered by reason of the wrongful death * * *.

"(B) Compensatory damages may be awarded in an action for wrongful death and may include damages for the following:

" * * *

"(3) Loss of society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, suffered by the surviving spouse, minor children, parents, or next of kin.

" * * *

"(5) The mental anguish incurred by the surviving spouse * * *."

■ We agree with the trial court's finding that Ryne's expert sufficiently testified to the probability and degree of Ryne's life expectancy and that the jury had before it sufficient evidence to find in favor of the decedent.

Garvey's Third Assignment of Error is overruled.

V

Construing the record most strongly in favor of Ryne, the nonmovant, we find that there was sufficient evidence to support the jury's verdict, upon which reasonable minds could reach different conclusions, and that the trial court properly denied Garvey's motion for judgment notwithstanding the verdict.

All of Garvey's assignments of error having been overruled, we affirm the decision of the trial court.

*Judgment affirmed.*

WOLFF and FREDERICK N. YOUNG, JJ., concur.