**RECHENBACH et al., Appellees,**

**v.**

**HAFTKOWYCZ, Appellant.**

[Cite as *Rechenbach v. Haftkowycz* (1995), 100 Ohio App.3d 484.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 66806, 66858.

Decided Jan. 30, 1995.

*Miller, Stillman & Bartel* and *Willard E. Bartel,* for appellees.

*Quandt, Giffels & Buck Co., L.P.A.,* and *Robert G. Quandt,* for appellant.

NAHRA, Chief Justice.

In this medical malpractice action, defendant-appellant Erast J. Haftkowycz, M.D., appeals in App. No. 66858 from the jury verdict in favor of plaintiffs-appellees Robin and Thomas Rechenbach on their complaint. Appellees also filed an appeal from the denial of prejudgment interest which was designated App. No. 66806; however, appellees have not presented any arguments supporting this appeal and it is therefore dismissed pursuant to Loc.App.R. 6(6). The facts relevant to defendant's appeal follow.

Robin Rechenbach ("appellee") became a patient of appellant, an obstetrician and gynecologist, in 1989 after she became pregnant with her third child. Appellant monitored appellee's pregnancy; his partner delivered appellee's baby

in January 1990. On February 27, 1990, appellee came to appellant's office for her six-week postpartum check-up. At that time appellant administered a PAP test to check for any abnormality in the cervical cells.

A few days later, appellant telephoned appellee with the results of the PAP test. He told her the test indicated that some moderate dysplasia, that is, abnormality of the cells, was present in the cervix. Appellant informed appellee of the types of treatment available for the condition but recommended she undergo a biopsy before taking further action. Appellee agreed.

On March 26, 1990, appellant performed a cone biopsy on appellee. Before they left the hospital on that day, appellant spoke to appellee and Mr. Rechenbach concerning the results of the biopsy. At that meeting, appellant recommended the treatment of appellee's dysplasia with a surgical procedure called laser ablation. During this treatment, the abnormal cells of the cervix would be "burned" away with a beam of intense light. Appellant recommended the surgery be done as soon as possible; therefore, while appellee was still at the hospital, the surgery was scheduled for April 19. On the same occasion, appellee was also scheduled for pre-admission testing ("P.A.T.") to be done by the hospital staff on April 17.

Appellee appeared at the hospital on April 17 as arranged. The P.A.T. was performed and included a pregnancy test. However, appellee could not undergo the April 19 surgery as arranged since she discovered she was menstruating. In consultation with appellant's office staff, appellee's surgery was rescheduled for May 3.

On April 26, appellee telephoned appellant's office to notify him that her baby would have to undergo cranial surgery. She requested her own surgery be postponed. Eventually, appellee's laser ablation surgery was scheduled for the afternoon of June 7, 1990. Appellee's P.A.T. was to be done in the morning of the same day. This time, the P.A.T. did not include a pregnancy test. Although appellant reviewed the P.A.T. prior to commencing surgery on appellee, he did not notice the absence of that particular test. He performed the laser ablation surgery as scheduled.

Following the procedure, which was successful at removing the abnormal cells, appellant told Mr. Rechenbach that appellee might experience some mild cramping or bleeding as a result of the operation. Appellee returned home that same day.

However, while she experienced some cramping and bleeding the day after her surgery, by the following morning, the heavy flow and the odd appearance of the blood alarmed appellee. Appellee thought she might be pregnant; she therefore caused Mr. Rechenbach to obtain a home pregnancy test for her. The results of

that test confirmed her suspicions. She telephoned appellant's office in the early afternoon to inform appellant of both the heavy discharge and the results of the home pregnancy test. Appellant spoke to her over the telephone and tried to calm her. He told her to go back to the hospital for a more reliable pregnancy test. Appellee did so that same evening.

When appellant obtained the results of the test, he told appellee that the hormone levels indicated she was indeed pregnant. Since at that time it was Saturday evening, appellant decided appellee should have another blood test and an ultrasound examination on the following Monday. Appellee's bleeding continued throughout the intervening day.

Appellee spoke to appellant over the telephone soon after the ultrasound examination on June 12. Appellee was concerned about effects the surgical procedure she had recently undergone might have on her fetus. Appellant reassured her and told her to telephone his office the next morning to schedule further care. When she did so, appellee learned that the bleeding and discharge she had been experiencing indicated she had miscarried. Appellee did not thereafter return to appellant's office. Appellee later learned that although Mr. Rechenbach had had a vasectomy in early 1990, the procedure had not been successful; therefore, appellee's ill-fated pregnancy apparently commenced sometime in May 1990. During his testimony at trial, appellant admitted that had a pregnancy test been performed on appellee on June 7, 1990, it would have indicated a positive result.

On September 30, 1992, appellees filed a four-count complaint in the Cuyahoga County Court of Common Pleas against appellant alleging medical malpractice.

In count one appellees alleged that prior to performing the laser ablation of the cervix on appellee Robin Rechenbach, appellant negligently failed to perform a pregnancy test, thereby "causing Robin Rechenbach to lose her child." Appellees claimed that as a result of appellant's negligence, appellee Robin Rechenbach suffered severe and permanent injury, including depression, loss of enjoyment of life, and "great pain of body and mind" and that she would continue to require medical care.

In count two of their complaint, appellees based their medical malpractice claims upon the doctrine of res ipsa loquitur, alleging that the injury suffered by appellee Robin Rechenbach was of a type which "does not ordinarily occur in the absence of negligence."

In counts three and four of their complaint, appellees asserted claims for negligent infliction of emotional distress and for loss of consortium on behalf of Thomas Rechenbach.

Pursuant to the requirements of R.C. 2309.01, later declared invalid by the Ohio Supreme Court in *Rockey v. 84 Lumber Co.* (1993), 66 Ohio St.3d 221, 611 N.E.2d 789, appellees demanded judgment on their complaint "for compensatory damages in an amount in excess of twenty-five thousand dollars," prejudgment interest, costs, attorney fees, and other "proper" relief.

Appellant answered the complaint, admitting "a pregnancy test was not performed immediately prior to the laser ablation" but denying negligence and denying "that the absence of such a test in any manner causally brought about a termination of [appellee's] alleged pregnancy." After the discovery process, the case proceeded to jury trial on December 6, 1993.

Appellees called appellant as their first witness. On cross-examination, appellant was asked to read the office notes he had made concerning his patient appellee. In relevant part, appellant's testimony follows:

"A. " * * * We talked about when she conceived, and I told her there is no way to tell when this happened under the circumstances.

" * * *

"Q. Go on.

"A. "However, if it happened after her 4/17 mentrual [*sic*] period, then the *spontaneous abortion was certainly inevitable when the laser therapy was performed* due to the low quantitative level on 6/9. * * *

" * * *

"Q. Just a few more questions, Doctor. To make sure we understand this, *Robin Rechenbach was [pregnant] on June 7th, was she not?*

"A. *Yes.*

"Q. *No pregnancy test was performed* during that preadmission testing procedure *prior to the laser ablation—*

"A. On June 7th.

"Q. —on June 7th, is that correct?

"A. *That's correct.*

"Q. *You wouldn't have done the laser ablation procedure on June 7th if you knew she was pregnant?*

"A. *That's correct.*

"Q. And her miscarriage in this particular case began on what date? Can you tell?

"A. I can't tell.

"Q. Somewhere between 6/8 and 6/10?

"A. There is no way to tell.

"Q. But we know by *June 12th* she was experiencing a miscarriage or *the miscarriage was complete, is that correct?*

"A. *Yes.*" (Emphasis added.)

Appellees also testified in their own behalf and presented the testimony of Dr. Jon Hazen as an expert in gynecology. Dr. Hazan opined that appellant's failure to ascertain whether appellee was pregnant before performing laser surgery on her cervix was below the acceptable standard of medical care. Dr. Hazen also testified he could state with a reasonable degree of medical certainty that appellee's miscarriage began with the laser surgery. Finally, appellees presented the testimony of a psychiatrist who had treated appellee Robin Rechenbach for depression.

At the conclusion of appellees' case, appellant moved for a directed verdict. Appellant's motion was made "with respect to the prayer of the complaint," counsel noting on the record for the first time that appellees had failed to amend the prayer to request a specific amount prior to trial as required by Civ.R. 54(C). The trial court overruled appellant's motion.

In his defense, appellant presented the testimony of two hospital nurses who admitted a pre-admission pregnancy test was not performed on appellee. However, on cross-examination appellant admitted it was his responsibility to review the P.A.T. prior to commencing surgery and that he had failed to do so in appellee's case. Moreover, neither appellant nor his expert, Dr. Laszlo Sogor, testified that appellant's actions in this regard met the acceptable standard of medical care. Appellant and his expert did, however, offer some testimony and evidence to dispute appellees' claim of a causal link between the laser surgery and the subsequent miscarriage.

Following the presentation of appellant's evidence, appellant renewed his motion for a directed verdict. The trial court denied the motion.

Both parties had previously submitted proposed jury instructions for the trial court's perusal. At this juncture of the trial, appellant noted for the record his objection to any jury instruction on "permanent or future damages." The case then proceeded to closing argument. Over appellant's objection, counsel for appellees argued that if the jury found for appellees on their complaint, the damage award should be not "less than one hundred thousand dollars" to appellee Robin Rechenbach and "not less than twenty-five thousand dollars" to appellee Thomas Rechenbach.

Following closing argument, the trial court proceeded to instruct the jury. With regard to damages, the trial court stated in pertinent part the following:

"If you find for the plaintiff you will decide by the greater weight of the evidence an amount of money that will reasonably compensate the plaintiff for the *actual injuries and resultant damages* proximately caused by the negligence of the defendant.

"In deciding this amount you will consider *the nature and extent of the injury, the effect upon physical and mental health, the pain and suffering experienced,* the ability or inability to perform usual activities, lost earnings, *and the reasonable cost of necessary medical and hospital expenses incurred.*

"From these you will determine what sum will compensate the plaintiff for injury to date, and in the future.

"As you know, the plaintiff claims that the injury will continue into the future, and will thus possibly incur future expenses, as well as pain and disability.

"*As to such future claims no damage may be found except that which is reasonably certain to exist* as a proximate result of the injury.

"*If you find* from the greater weight of the evidence *that as a proximate result of the injury sustained the plaintiff has suffered some type of permanent or future disability,* which has been evidenced by way of an inability to perform the usual activities of life, such activities which had given pleasure to this particular plaintiff, *you may consider and make a separate award for such damages.*

"*With regard to any future claims you are not to speculate.* The law deals in probabilities and not mere possibilities.

"If you find for the plaintiffs you will consider and include an amount that will reasonably compensate Mr. Rechenbach which you find resulted from a loss of consortium.

"Consortium consists of services, sexual relations, companionship, comfort, solace, and love of the other spouse.

"*There is no recognized unit value for pain and suffering and disability.* It is solely within your province, in the event you find for the plaintiff, to fix that sum." (Emphasis added.)

The jury rendered a general verdict in the amount of $110,000 for appellees on their complaint. Four interrogatories had been submitted to the jury; the jury's responses to these follow:

"(1) Was defendant negligent? Yes.

"(2) Did defendant's negligence proximately cause damages to plaintiffs? Yes.

"(3) What sum do you award as damages on behalf of plaintiff Robin Rechenbach? $80,000.00.

"(4) What sum do you award as damages on plaintiff Thomas Rechenbach's loss of consortium claim?  $30,000.00."

The trial court entered judgment on the jury's verdict on December 10, 1993.

Appellant presents three assignments of error for this court's review which will be addressed in logical order.

## I

Appellant's second assignment of error states:

"Given the testimony that plaintiff's miscarriage could have resulted from any one of several causes, in failing to produce evidence excluding the effectiveness of those causes for which the defendant is not legally responsible, the plaintiffs have not sustained their burden of proof."

Appellant argues that since some of the evidence adduced at trial indicated there may have been other "potential" causes of appellee's miscarriage unrelated to the laser ablation surgery, appellees failed to sufficiently establish proximate cause, and that therefore, reversal of the jury's verdict is in order.  Upon a review of the record, however, it is clear that appellant's argument is unsupportable.

The Ohio Supreme Court has recently responded to a similar argument as follows:

"Appellee [defendant] has accurately noted that appellants [plaintiffs] bear the burden of persuasion with respect to every aspect of their claim, including causation.  Nevertheless, the *probability requirement applicable to expert opinion testimony is not limited to that adduced by appellants.*  Inasmuch as the expression of probability is a condition precedent to the admissibility of expert opinion regarding causation, it relates to the competence of such evidence and not its weight.  See *State v. Benner* (1988), 40 Ohio St.3d 301, 313, 533 N.E.2d 701, 714.  Accordingly, *it is essential to focus on the quality of the evidence adduced regardless of the identity of its proponent.*

"In this regard, *appellee has confused the burden of persuasion,* which is generally borne by the plaintiff in a negligence action, *and the duty imposed upon the proponent of a fact to adduce competent evidence sufficient to establish its existence.  The former burden was and continued to be the responsibility of the appellants.  In order to present a jury question* and avoid a directed verdict, *appellants were required to satisfy the burden of production by establishing a prima facie case.*  See 2 McCormick, Evidence (4 Ed. Strong Ed.1992) 425, Section 336.  *This burden is satisfied by adducing competent evidence supporting the existence of a duty, breach of the duty, causation based on probability*

*and damages. Once a prima facie case has been demonstrated, the adverse party may attempt to negate its effect* in various ways. He may cross-examine the expert of the other party. He may adduce testimony from another expert which contradicts the testimony of the expert for his adversary. Further, *he may adduce expert testimony which sets forth an alternative explanation for the circumstances at issue. If this last approach is pursued, the evidence directed to the alternate explanation is governed by the same standard* of admissibility applicable to the evidence adduced by his adversary." (Emphasis added.) *Stinson v. England* (1994), 69 Ohio St.3d 451, 455–456, 633 N.E.2d 532, 537.

In this case, appellees made a prima facie demonstration of proximate cause. Appellant testified on cross-examination that he noted appellee's miscarriage was *"certainly* inevitable when the laser therapy was performed." Moreover, appellees' expert, Dr. Hazen, stated he believed to a reasonable degree of medical certainty that appellee's miscarriage "began with the surgery" and that there was a *direct* causal relationship between appellant's failure to do a pregnancy test and appellee's miscarriage. This evidence was sufficient to sustain appellees' burden of proof of causation. *Stinson v. England, supra; Cooper v. Sisters of Charity* (1971), 27 Ohio St.2d 242, 56 O.O.2d 146, 272 N.E.2d 97; *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 592 N.E.2d 828; *Bailey v. Emilio C. Chu, M.D., Inc.* (1992), 80 Ohio App.3d 627, 610 N.E.2d 531; *Ryne v. Garvey* (1993), 87 Ohio App.3d 145, 621 N.E.2d 1320.

Appellant's evidence did not negate appellant's prima facie case. He and his expert essentially testified that from fifteen to twenty percent of *all* pregnancies can miscarry. Although they opined that appellee's miscarriage was "more likely than not" attributable to some cause other than the laser ablation surgery, in view of appellees' evidence to the contrary, this issue was for the jury to determine. *Stinson v. England; Ramage v. Cent. Ohio Emergency Serv., Inc., supra.*

For the foregoing reasons, appellant's second assignment of error lacks merit and is accordingly overruled.

## II

Appellant's first assignment of error states:

"The trial court's jury instruction permitting an award for future damages constitutes reversible error in that there is no evidentiary predicate in the record to substantiate such a recovery."

Appellant argues the trial court erred in its instructions to the jury. He contends the trial court's inclusion of an instruction on future damages "invited" the jury to make an award for future damages. Appellant cites *Day v. Gulley*

(1963), 175 Ohio St. 83, 23 O.O.2d 382, 191 N.E.2d 732, in support of his argument.

The court stated the following in *Day v. Gulley, supra,* at syllabus:

"In a personal injury action, *where the plaintiff's injuries are subjective in character* and there is no expert medical evidence as to future pain, suffering, *permanency of injuries* or lasting impairment of health, it is prejudicial error for the trial court to charge the jury in its general instructions that, "in determining the amount of damages, the jury should consider the nature and extent of the injuries, whether or not the injuries are in all probability permanent or temporary only; the pain and suffering plaintiff has endured and with reasonable certainty will endure in the future." (Emphasis added.)

■ Appellant comments extensively on appellees' failure to present expert testimony on the issue of future damages. The issue is not whether appellees proved any future damages, but whether they proved they suffered an "objective" as opposed to a merely "subjective" injury so as to justify the jury's award. See, *e.g., Powell v. Montgomery* (1971), 27 Ohio App.2d 112, 118–119, 56 O.O.2d 279, 283, 272 N.E.2d 906, 911.

"[A]n injury is 'objective' when, *without more,* it will provide an evidentiary basis for a jury to conclude with *reasonable* certainty that future damages, such as medical expenses will *probably* result. See *Spargur v. Dayton Power & Light Co.* [1959], 109 Ohio App. 37 [10 O.O.2d 207, 163 N.E.2d 786]." *Id.* (Emphasis added.)

■ The injury appellee Robin Rechenbach suffered as a result of appellant's negligence, *viz.,* a miscarriage, is an "objective" injury. The fact that pain and suffering are subjective *feelings* makes the injury itself no less objective.

In this case, both appellees testified concerning the pain and suffering they had experienced because of the miscarriage. Moreover, they also testified they continued to experience pain and suffering up to the time of trial. Their testimony was sufficient evidence to prove damages occurred as a result of the injury and were continuing. "Since pain and suffering are subjective feelings, the injured person's testimony is the only direct proof of such damages." *Youssef v. Jones* (1991), 77 Ohio App.3d 500, 505, 602 N.E.2d 1176, 1179; *Turner v. Barrett* (1980), 68 Ohio App.2d 80, 22 O.O.3d 74, 426 N.E.2d 1193.

■ Considering the jury instructions as a whole, and in view of the fact that the interrogatory submitted to the jury concerning the damage award was not specific, and, furthermore, taking into account the nature of appellees' injury and the evidence of damages adduced at trial, this court cannot conclude the trial court erred in this matter. *Fischer v. Dairy Mart Convenience Stores, Inc.*

(1991), 77 Ohio App.3d 543, 602 N.E.2d 1204; *Fantozzi v. Sandusky Cement Prod. Co.* (1992), 64 Ohio St.3d 601, 597 N.E.2d 474.

Therefore, appellant's first assignment of error is also overruled.

## III

Appellant's final assignment of error states:

"Having neglected to specify her monetary damage request at least seven days before trial, the plaintiffs are barred from recovering damages in excess of $25,000."

■ Appellant argues appellees' failure to amend their complaint to request a specific damage award as required by Civ.R. 54(C) and R.C. 2309.01(D) mandates a limitation on the award. Appellant contends that since the only concrete figure named in appellant's complaint was $25,000, their recovery is limited to that amount. Appellant further contends that the Supreme Court's decision in *Rockey v. 84 Lumber Co., supra,* supports his argument. Based upon the language of that case, however, this court does not agree.

The *Rockey* court stated in pertinent part the following:

"Prior to enactment of [R.C. 2309.01], plaintiff had the option of filing an amended demand for judgment pursuant to Civ.R. 54(C). However, since plaintiff could specify an actual amount of damages in the original complaint under Civ.R. 8(A), which Civ.R. 8(A) requires plaintiff to do, he did not have to amend the demand for judgment at a later date. With the enactment of R.C. 2309.01, plaintiff is required to amend the complaint in order to state an actionable cause and comply with Civ.R. 8(A). *This additional requirement has led to harsh results in that plaintiffs who specify no actual damages in the original complaint, in an attempt to comply with R.C. 2309.01, face a judgment for zero damages when they do not later comply with the R.C. 2309.01 requirement that they amend the complaint.* Regardless of whether these situations are framed as failure to comply with Civ.R. 54(C) or as noncompliance with R.C. 2309.01, they are all *glaring examples of the inherent unfairness* which results from the R.C. 2309.01 requirement that plaintiff specify no damages in the original complaint when those damages are in excess of twenty-five thousand dollars." (Emphasis added.) *Id.,* 66 Ohio St.3d at 224, 611 N.E.2d at 791.

Thus, the Supreme Court's decision in *Rockey* obviously both contemplated and encompassed a situation such as that which occurred in this case. In *Rockey,* the court made it clear that plaintiffs were not to be faulted for their failure to amend their prayer for damages since they were attempting to deal with an "inherently unfair" scheme. This court finds support for such an interpretation in *Bobich v. Convenient Food Mart 3-109* (1993), 66 Ohio St.3d 228, 611 N.E.2d 794; both the

fact situation and the argument raised in *Bobich* precisely parallel those of the case *sub judice.*

Therefore, appellant's third assignment of error also lacks merit and is accordingly overruled.

The judgment of the trial court in App. No. 66858 is affirmed and the appeal in App. No. 66806 is dismissed.

*Judgment accordingly.*

NUGENT and PARRINO, JJ., concur.

THOMAS J. PARRINO, J., retired, of the Eighth Appellate District, sitting by assignment.