[Cite as *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 2012-Ohio-5154.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

SETH NILES CROMER, et al.

     Appellants

     v.

CHILDREN'S HOSPITAL MEDICAL
CENTER OF AKRON

     Appellee

C.A. No.      25632

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV 2008 07 4775

DECISION AND JOURNAL ENTRY

Dated: November 7, 2012

---

CARR, Presiding Judge.

{¶1} Appellants, Melinda Cromer, individually; and Roderick Cromer, Jr., individually and on behalf of their late son Seth; appeal from a judgment entered on a jury verdict for Children's Hospital Medical Center of Akron on the Cromers' claims against it, which alleged that their son's death was caused by medical negligence of the hospital's employees. Because the trial court incorrectly stated the law when it instructed the jury about the hospital's standard of care, this Court reverses and remands for a new trial.

I.

{¶2} This case involves the death of five-year-old Seth Cromer during the early morning hours of January 14, 2007, while he was being treated as a patient in the pediatric intensive care unit ("PICU") at Children's Hospital. Seth had been diagnosed with an ear infection by his pediatrician several days earlier and, although he had been taking antibiotics and had shown signs of improvement initially, his condition worsened after several days. Seth's

parents brought him to the hospital emergency room because he had developed a stomach ache and fever, and was clammy, cold, and listless.

{¶3} Because many of the specific details about Seth's treatment at the hospital are disputed by the parties, this Court will confine its recitation of facts primarily to those that are not disputed. Due to an unexplained failure of the hospital to document what transpired in the first exam room, an error in which another patient's information was noted on Seth's medical records, and apparently because the hospital staff became too busy with the hands-on treatment of Seth, Seth's hospital records include incomplete details about the progression of his symptoms and the treatment he received while in the emergency room. Therefore, most of the evidence about the time Seth spent in the emergency room came from the conflicting recollections of witnesses.

{¶4} It is not disputed that, at approximately 10:44 p.m., shortly after his arrival at the hospital emergency room, Seth was assessed by a triage nurse, who noted that he was pale, had a tender abdomen, and had a fast heart rate. Although Seth had no fever at that time, his parents stated that they had given him Advil a few hours earlier. The nurse assigned Seth a triage level of "urgent," which indicated that he needed to be seen by a physician quickly.

{¶5} Seth was initially assigned to exam room 18 and remained in that room for approximately 30 minutes. At some point, a doctor assessed Seth and concluded that he was in shock because he was dehydrated, had an elevated heart rate and elevated respiratory levels, and his blood pressure was decreasing. At approximately 11:20 or 11:30, the doctor ordered that Seth be moved to exam room 3, which had more equipment to monitor his vital signs and was closer to the nurses' station.

**{¶6}** The doctor ordered that Seth be given normal saline fluids intravenously. Due to an error by one of the nurses, however, Seth was given D5 ½ normal saline, which was not the correct or optimal fluid to treat his dehydration. The evidence is disputed, however, about how much of that incorrect fluid Seth received and what, if any, negative impact it had on his condition. When the emergency room doctor realized the error, he ensured that Seth began receiving normal saline solution through his IV. At some point, epinephrine was added to Seth's intravenous fluids, in an attempt to increase his blood pressure. The epinephrine was later increased to a high dose, although the exact dosage is disputed. The negative or positive impact of the epinephrine was also disputed by the parties.

**{¶7}** Shortly after midnight, Seth was transferred to treatment room 1. While in that room, Seth seemed to show some signs of improvement because he was more alert and was talking. In hindsight, however, given some of his other symptoms, experts agreed that Seth was actually in compensated shock, meaning that his body was attempting to compensate for the shock. Although his physical condition might have appeared in some ways to be improving, it was actually getting worse. Because the emergency room doctor apparently recognized that Seth was in compensated shock and believed that he was in critical condition, Seth was transferred to the pediatric intensive care unit ("PICU") at approximately 1:14 a.m.

**{¶8}** Shortly after Seth arrived in the PICU, the critical care doctor assessed him and also determined that he was in shock. Suspecting that Seth's shock had progressed to the point that he had acidosis, the doctor believed that he would probably need to intubate Seth and place him on a ventilator. Ventilation would help reduce the acidosis by decreasing the carbon dioxide levels in the blood. The doctor first placed a central venous line to establish stable intravenous access to continue administering the epinephrine and other medications, if needed. He then

placed an arterial line to draw blood for testing, which revealed that Seth was suffering from significant acidosis. The doctor intubated Seth at approximately 2:15 - 2:25 a.m., and then ordered an echocardiogram. During the echocardiogram procedure, at approximately 3:45, Seth went into cardiac arrest and a code blue was called. Cardiopulmonary resuscitation was not successful and Seth was pronounced dead at 4:05 a.m.

{¶9} The Cromers filed this action against the hospital and several individual defendants, alleging that Seth's death was caused by the negligent medical care that he received at the hospital. The individual defendants were later dismissed and case proceeded to trial against the hospital. At trial, although there was disputed evidence about some of the treatment that Seth received, particularly while in the emergency room, the primary dispute between the parties was the cause of Seth's death. All experts agreed that Seth died due to coronary failure. The dispute involved whether his heart failure was caused by an unknown, pre-existing heart defect or the hospitals' failure to properly treat the septic shock that had developed from his viral infection.

{¶10} The Cromers' medical expert, Dr. Margaret Parker, testified that, although Seth's autopsy revealed that he had a pre-existing narrowing of his left coronary artery, that condition did not cause his death. Instead, she opined that Seth died due to septic shock that had not been appropriately and timely treated at the hospital but was allowed to progress to severe cardiac and respiratory failure. She explained that, when Seth arrived at the hospital, he was suffering from septic shock, which, if not quickly treated and reversed, can lead to cardiac shock. She further explained that untreated shock can lead to acidosis, which if not treated will ultimately cause death. Dr. Parker pointed to evidence that Seth developed both respiratory and metabolic acidosis while in the emergency room. She further explained that the primary method of treating

acidosis is to intubate the patient and put him on a ventilator. Intubation and ventilation help to decrease the patient's respiratory rate and the stress on his heart and allow carbon dioxide to be released and oxygen to be increased in the blood.

{¶11} Dr. Parker testified that the hospital departed from the standard of care by not intubating Seth sooner, or no later than 12:15 a.m., when his blood gas levels indicated that he was suffering from severe acidosis. She explained that, by the time Seth was actually intubated after 2:00 a.m., he had already "fallen off the cliff" and it was too late to save his life. Dr. Parker further testified that the hospital departed from the standard of care by not treating Seth within 30 minutes of his arrival at the hospital, by not giving him intravenous fluids sooner, and by giving him the wrong intravenous fluids.

{¶12} According to the results of the autopsy performed by a pediatric pathologist at the hospital, Seth died of heart failure that was the combined result of a pre-existing narrowing of his left coronary artery and a viral infection that had spread to his heart. The hospital's experts testified that Seth's pre-existing heart problem caused his acidosis and his eventual death because his heart could not pump effectively. They testified that there was nothing more that the treating physicians could have done to save Seth's life.

{¶13} During Dr. Parker's testimony, the hospital objected and later moved to strike her testimony, asserting that she was not qualified as a medical expert pursuant to Evid.R. 601(D) because she did not devote at least half of her professional time to active clinical practice. The hospital then moved for a directed verdict on that basis, arguing that, without the expert's testimony, the Cromers had not presented a prima facie claim of medical malpractice. The trial court denied both motions.

{¶14} Following the presentation of evidence, over the Cromers' objection, the trial court instructed the jury that, in determining whether the hospital exercised its duty of care, the jury was required to consider whether the treating professionals should have foreseen that Seth Cromer's death was a natural and probable result of their actions or inactions.

{¶15} The jury returned a general verdict in favor of the hospital. In response to its first interrogatory, the jury indicated that the plaintiffs had not proven that the hospital was negligent. The trial court entered judgment for the hospital. The Cromers moved for a new trial, but the trial court denied their motion.

{¶16} The Cromers appeal and raise three assignments of error. The hospital raises one assignment of error, in the event this Court finds merit in any of the Cromers' assignments of error and reverses the judgment.

II.

**APPELLANT'S ASSIGNMENT OF ERROR I**

THE COURT ERRED IN INSTRUCTING THE JURY.

{¶17} Through their first assignment of error, the Cromers argue that the trial court committed reversible error by improperly instructing the jury on the hospital's standard of care. Specifically, over their objection, the trial court instructed the jury that, in determining whether the hospital exercised ordinary care, it was required to consider "whether the defendant should have foreseen under the attending circumstances that the natural and probable result of an act or failure to act would cause Seth Cromer's death." The Cromers argue that the trial court's instruction that defined the hospital's standard of care as requiring it to consider the foreseeability of Seth's death was an incorrect statement of law and constituted reversible error in this case. We agree.

{¶18} Generally, to establish a claim of negligence, the plaintiff must prove the existence of a duty by the defendant, breach of that duty, and an injury proximately caused by that breach of duty. *Menifee v. Ohio Welding Products, Inc.* 15 Ohio St.3d 75, 77 (1984). A fundamental aspect of proving negligence is determining whether the defendant owed the plaintiff a duty. *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142 (1989). It is well established that the existence of a duty will depend, in part, on the foreseeability of injury to the plaintiff. *Menifee* at 142.

{¶19} The defendant's duty to exercise due care to protect the plaintiff does not arise unless the risk of injury is foreseeable:

> In delimiting the scope of duty to exercise care, regard must be had for the probability that injury may result from the act complained of. No one is bound to take care to prevent consequences which, in the light of human experience, are beyond the range of probability. Only when the injured person comes within the circle of those to whom injury may reasonably be anticipated does the defendant owe him a duty of care.

*Gedeon v. E. Ohio Gas Co.,* 128 Ohio St. 335, 338 (1934).

{¶20} In addition to the foreseeability of injury, the existence and scope of a tort duty will depend upon the relationship between the parties. *Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 645 (1992). "Duty, as used in Ohio tort law, refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff." *Commerce & Industry Ins. Co. v. Toledo*, 45 Ohio St.3d 96, 98 (1989), citing *Baltimore & Ohio Southwestern Ry. Co. v. Cox,* 66 Ohio St. 3d 276, 278 (1902).

{¶21} Certain relationships, by their very nature, impose a duty on the part of one person to act for the benefit of another. *Berdyck v. Shinde*, 66 Ohio St.3d 573, 578 (1993). The defendant's duty is imposed by law in those relationships specifically due to the "risks and

dangers inherent in the relationship." *Id*. at 579. In other words, the law has recognized that a duty will be imposed in those relationships because there is always some foreseeability of injury. "The most frequently applied example of persons of superior knowledge and skill who are held to a standard of good practice is that of physicians." *Id*. "The law imposes on physicians engaged in the practice of medicine a duty to employ that degree of skill, care and diligence that a physician or surgeon of the same medical specialty would employ in like circumstances." *Id*., citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130 (1976). Unless the allegations that the defendant deviated from the standard of care are obvious to a lay person, "[p]roof of the recognized standards must necessarily be provided through expert testimony." *Bruni* at 131–132. The expert testimony establishes the standard of care. "A negligent failure to discharge that duty constitutes 'medical malpractice' if it proximately results in an injury to the patient." *Berdyck* at 579, citing *Bruni* at 134-135.

{¶22} Under Ohio law, in order to present a prima facie claim of medical malpractice, a plaintiff must establish: (1) the standard of care, as generally shown through expert testimony; (2) the failure of defendant to meet the requisite standard of care; and (3) a direct causal connection between the medically negligent act and the injury sustained. *Bruni v. Tatsumi*, 46 Ohio St.2d at paragraph one of the syllabus. "[T]he duty of the physician is established simply by the existence of a physician-patient relationship, not by questions of foreseeability." *Oiler v. Willke*, 95 Ohio App.3d 404, 409, fn.2 (4th Dist. 1994). "[P]hysicians are said to owe patients a legal duty to use recognized standards of professional knowledge and skill." *Ryne v. Garvey*, 87 Ohio App.3d 145, 155 (2d Dist.1993). A plaintiff proves a breach of duty by showing that the physician failed to act in accordance with those established norms. *Id.* Consequently, evidence

that the physician could have foreseen the patient's injury is irrelevant because "[f]oreseeability is not determinative of a physician's legal duties." *Id.* at 154-155.

{¶23} The hospital cites *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St.3d 86 (1988), to support its position that foreseeability of injury was relevant to its duty in this case, but that case has no application here. Although the *Littleton* plaintiffs brought claims alleging medical malpractice, they did not allege that injuries to a patient had resulted from the quality of medical care provided by the defendant. Instead, the *Littleton* plaintiffs sought to recover for the wrongful death of a third party, who had been killed by her mother, based on the alleged negligence of the mother's psychiatrist in failing to control her actions and prevent her from harming her child. *Id.* at 91-92. The alleged duty by the psychiatrist was not to his patient, but to her daughter, with whom he had no physician-patient relationship. Foreseeability of injury was relevant in that medical malpractice case because the plaintiffs sought to establish the existence of a new duty by the treating physician, as Ohio law did not recognize a duty on the part of a psychiatrist to control the conduct of his patient to protect third parties from injury. *Id.* at 92.

{¶24} In this case, the Cromers' only allegations of medical malpractice by the hospital pertained directly to the quality of medical treatment that Seth received while a patient there. There was no question in this case that the hospital and its treating professionals owed a duty of care to Seth, that the existence of the hospital's duty was imposed by law, and that the scope of its duty would be established at trial solely through expert testimony about the applicable standard of care. The risks inherent in treating patients in the emergency room and intensive care unit of the hospital had already been taken into account in establishing the professional standard of care. The Cromers were not required to prove actual foreseeability of Seth's death

by the treating professionals in this case. Therefore, instructing the jury to that effect was an incorrect statement of law and constituted reversible error.

{¶25} We cannot conclude that this error was harmless because, although the jury also found that the Cromers failed to prove causation in this case, the jury's causation finding was not that the hospital's actions or inactions did not cause Seth's death but that the hospital's "negligence" did not cause his death. The jury indicated in its answer to the first jury interrogatory that the Cromers failed to prove that the hospital was negligent. Given that finding, it was instructed not to answer the remaining interrogatories. Nevertheless, the jury answered "No" to the third interrogatory, which asked:

> Do you find that the Plaintiffs *** have proven by a preponderance of the evidence that the negligence of Defendant CHILDREN'S HOSPITAL MEDICAL CENTER OF AKRON was a direct and proximate cause of Seth Cromer's death?

{¶26} The proximate cause finding was directly tied to the jury's finding that the hospital was not negligent. The jury had no choice but to find that the hospital's negligence was not the proximate cause of Seth's death because it had already found that there was no negligence by the hospital. Consequently, we cannot conclude that the trial court's improper instruction on the hospital's standard of care did not affect the ultimate outcome in this case.

{¶27} Because the hospital's standard of care did not involve a jury question about whether the treating professionals in this case could have foreseen Seth's death due to their actions or inactions, the trial court committed reversible error by so instructing the jury. The Cromers' first assignment of error is sustained.

## APPELLANT'S ASSIGNMENT OF ERROR II

THE JURY'S VERDICT IN THIS MATTER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**APPELLANT'S ASSIGNMENT OF ERROR III**

THE COURT ERRED IN FAILING TO GRANT APPELLANTS' MOTION
FOR A NEW TRIAL.

{¶28} Because this Court has reversed and remanded the trial court's judgment based on the improper jury instruction, the Cromers' second and third assignments of error have been rendered moot and will not be addressed. App.R. 12(A)(1)(c).

**THE HOSPITAL'S ASSIGNMENT OF ERROR**

PLAINTIFFS' ONLY EXPERT WITNESS WAS NOT COMPETENT TO
TESTIFY BECAUSE SHE DOES NOT DEVOTE AT LEAST 50% OF HER
PROFESSIONAL TIME TO THE ACTIVE CLINICAL PRACTICE OF
MEDICINE. HER TESTIMONY ON THE STANDARD OF CARE SHOULD
HAVE BEEN STRICKEN AND A DIRECTED VERDICT IN FAVOR OF
CHILDREN'S HOSPITAL SHOULD HAVE BEEN RENDERED.

{¶29} Next, because this Court reverses the trial court's judgment, it will address the hospital's assignment of error. The hospital challenges the trial court's denial of its motion to strike the testimony of the Cromers' medical expert, Dr. Margaret Parker, because she was not competent to testify. It furthers asserts that, without Dr. Parker's testimony, which was essential to the Cromers' claim, it would have been entitled to a directed verdict.

{¶30} The hospital objected to the testimony of Dr. Parker and, at the close of the Cromers' case, argued that she was not competent to testify pursuant to Evid.R. 601(D). Although the hospital also now challenges the qualifications Dr. Parker to testify about the field of emergency medicine, it did not raise that challenge in the trial court when it moved to disqualify her testimony and has therefore forfeited the issue on appeal. *E.g.*, *State v. Tibbetts*, 92 Ohio St.3d 146, 161 (2001).

{¶31} Consequently, the challenge on appeal is limited to whether Dr. Parker was competent to testify as a medical expert pursuant to Evid.R. 601(D), which requires that, to be

competent to give expert testimony in this case on the issue of the hospital's liability, the expert must hold a state license to practice medicine and "devote[] at least one-half of his or her professional time to the active clinical practice in his or her field of licensure, or to its instruction in an accredited school." *See also* R.C. 2743.43(A)(2)(although superseded by Evid.R. 601(D), it includes the same "active clinical practice" language that has been construed by the Ohio Supreme Court); *Celmer v. Rodgers*, 114 Ohio St.3d 221, 2007-Ohio-3697, ¶ 17.

{¶32} The sole dispute here is whether Dr. Parker devoted at least half of her professional time to "active clinical practice" in her field of pediatric critical care or "instruction in an accredited school." The term "active clinical practice" is not defined in the Ohio Rules of Evidence, nor is it defined in R.C. Chapter 2743. Consequently, it has been judicially construed according to common usage, with an understanding that the purpose of this competency requirement is to preclude testimony by professional witnesses, or those who spend much of their professional time testifying against fellow professionals rather than gaining practical experience in the field they seek to judge. *McCrory v. State*, 67 Ohio St.2d 99, 103-104 (1981). The *McCrory* court further stressed that, although the phrase primarily includes the work of physicians treating their patients, it must also encompass the work done by physicians away from the patient's bedside "assisting, directing, or advising" the care provided by the treating physician, as they are also directly involved in the care of the patient and are aware of the progress and ultimate result of the treatment. *Id.* at 103. Therefore, the *McCrory* court construed the term "active clinical practice" to include "the physician-specialist whose work is so related or adjunctive to patient care as to be necessarily included in that definition for the purpose of determining fault or liability in a medical claim." *Id.* at syllabus.

{¶33} In *Celmer v. Rodgers*, 2007-Ohio-3697, ¶ 23, the Ohio Supreme Court "reiterate[d] that the purpose of Evid.R. 601(D) is to prohibit a physician who makes his living as a professional witness from testifying on the liability of physicians who devote their professional time to the treatment of patients."  Moreover, a trial court has discretion to determine whether a witness is competent as an expert under Evid.R. 601(D) and the court's decision will not be reversed "absent a clear showing that the court abused its discretion." *Id.* at ¶ 19.

{¶34} In this case, the hospital argues that Dr. Parker failed to satisfy the competency threshold that half of her professional time was devoted to the active clinical practice of critical care medicine.  It focuses its argument on the following testimony that it elicited during its cross-examination of her:

Q. * * * [Y]ou agree with me that only 25 percent of your time is clinical care, right?

A. Yes.

Q. Seventy-five percent of your time is administrative care or administrative function, true?

A. Administrative and teaching.  I have some teaching responsibilities outside of the clinical arena, but, yes, pretty much.

Q. Would you agree with me now, doctor, as you sit on the witness stand right now that less than half of your time is clinical care and teaching?

A. Yes.

{¶35} Through her other testimony, Dr. Parker had the opportunity to explain the 75/25 percent allocation of her professional time in more detail.  She testified that, like most pediatric intensive care specialists, she rotates direct patient care with other physicians assigned to the unit.  Each physician is on 24-hour call in the PICU for one week and then off-call for three weeks because the round-the-clock work is "too stressful" and "too fatiguing" to maintain that

schedule every week. Because she was directly responsible for patient care in the PICU 24 hours a day during her one week on call, she testified that she worked 168 hours each month in direct patient care in the PICU. Given that she would work much shorter days during her three weeks outside the PICU, she actually devoted close to half of her professional time each month to direct patient care in the PICU. She also testified that she sometimes assisted her colleagues in the PICU during the weeks that she was not on call.

{¶36} Moreover, although the hospital suggests that Dr. Parker's "administrative" time could not qualify as active clinical practice, we do not agree. Dr. Parker explained that, during the weeks that she was not actively treating patients in the PICU, she devoted much of her professional time to oversight of intensive care treatment at the hospital. She had been the director of the PICU at Stony Brook University for seventeen years. Although she did not explain her oversight duties in detail, overseeing the work of other medical professionals in their treatment of patients involves the type of "assisting, directing, or advising," that was contemplated by the *McCrory* court as "so related or adjunctive to patient care" that it falls within the definition of "active clinical practice." 67 Ohio St.2d at 103-104.

{¶37} Dr. Parker further testified that she taught pediatrics at the university, although she did not indicate how much of her time was devoted to her teaching duties. In addition to her other professional responsibilities, Dr. Parker had been nationally recognized as a leader in the critical care field and was actively involved with scholarly publications. Dr. Parker was an associate editor of Critical Care Magazine, which required her to evaluate and screen peer reviews of all medical literature submitted for publication. She was also on the editorial board of Pediatric Critical Care Magazine. In addition to editorial responsibilities, Dr. Parker had written many of her own scholarly articles in the field of pediatric critical care medicine, particularly on

the topic of septic shock and its association with myocarditis and cardiogenic shock, which was directly related to the substance of her expert testimony in this case.

{¶38} The record demonstrates that Dr. Parker was not a professional witness but was actively involved in the clinical practice of pediatric critical care medicine. Given the evidence before the trial court about Dr. Parker's extensive experience, which was directly related to the substance of her testimony in this case, this Court cannot conclude that the trial court abused its discretion by determining that she was competent to testify as a medical expert under Evid.R. 601(D). Therefore, the hospital's assignment of error is overruled.

III.

{¶39} The Cromers' first assignment of error is sustained, which renders moot their remaining assignments of error. Consequently, the Cromers' second and third assignments of error were not addressed. The hospital's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is reversed and remanded for a new trial.

Judgment reversed
and cause remanded.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

DONNA J. CARR
FOR THE COURT

DICKINSON, J.
BELFANCE, J.
CONCUR.

APPEARANCES:

JACK MORRISON, JR., THOMAS R. HOULIHAN, and VICKI L. DESANTIS, Attorneys at Law, for Appellant.

GREGORY R. ROSSI and GREGG A. PEUGEOT, Attorneys at Law, for Appellee.