McKINNEY et al., Appellants,

v.

SCHLATTER et al., Appellees.

[Cite as *McKinney v. Schlatter* (1997), 118 Ohio App.3d 328.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

No. CA96–05–100.

Decided Feb. 18, 1997.

*Santen & Hughes, John D. Holschuh, Jr.,* and *Thomas R. Kirby,* for appellants.

*Jenks, Surdyk & Cowdrey Co., L.P.A.,* and *Robert F. Cowdrey,* for appellees Frances C. Schlatter, M.D., and Middletown Acute Care Specialists, Inc.

*Scheper & McGowan* and *James H. Scheper,* for appellees Joseph A. Solomito, M.D., and Joseph A. Solomito & Associates, Inc.

WALSH, Presiding Judge.

On February 11, 1994, Lanny D. McKinney ("McKinney") sought treatment at Middletown Regional Hospital ("MRH") for acute chest and abdominal pain. McKinney arrived at MRH at approximately 4:00 a.m. and was examined by the attending emergency room physician, defendant-appellee, Frances C. Schlatter, M.D. Dr. Schlatter applied a nitroglycerin paste to McKinney's chest and ordered hospital personnel to perform two electrocardiograms ("EKGs"), a chest x-ray, and various other diagnostic tests. Dr. Schlatter also gave McKinney a gastrointestinal "cocktail," which caused him to vomit a small amount of blood.

Dr. Schlatter received the chest x-ray, the first EKG, and the results of most of the other diagnostic tests she had ordered at approximately 5:00 a.m. Dr. Schlatter examined the information and then telephoned MRH's cardiologist on call that morning, defendant-appellee, Joseph Solomito, M.D., at his home. Dr. Schlatter described the chest x-ray, the first EKG, and the results of the other tests to Dr. Solomito. Dr. Schlatter also told Dr. Solomito that McKinney's blood pressure had fallen significantly since he had first arrived at the hospital. Dr. Solomito told Dr. Schlatter that he did not think McKinney's problem was cardiac

in nature and instead suggested that McKinney's symptoms might be the result of some gastrointestinal problem. Dr. Solomito then told Dr. Schlatter to look for other causes and to repeat the EKG. Dr. Schlatter, who had already ordered a second EKG, got the results of the second EKG during her telephone conversation with Dr. Solomito.

Dr. Schlatter ordered a second chest x-ray, a series of abdominal x-rays, and an arterial blood gas analysis. Dr. Schlatter also gave McKinney an antacid and fluids to raise his blood pressure. Dr. Schlatter then called Dr. Solomito a second time because she was unsure whether McKinney might be suffering from an "unstable angina." Dr. Solomito again told Dr. Schlatter that he did not think the cause of McKinney's pain was cardiac in nature. Dr. Solomito then told Dr. Schlatter to continue to evaluate McKinney. Dr. Solomito did not, however, recommend or suggest further testing. Dr. Schlatter instructed McKinney to make an appointment with his family doctor for a thorough examination and then discharged him at approximately 7:30 a.m. McKinney died of a dissecting aortic aneurysm later that morning.

On October 12, 1994, plaintiff-appellant, Linda J. McKinney, executor of the estate of Lanny D. McKinney, brought suit against Drs. Schlatter and Solomito, and defendant-appellee, Middletown Acute Care Specialists, Inc., for medical malpractice and wrongful death. The complaint alleged that McKinney's death was proximately caused by appellees' failure to provide adequate medical care. The case was tried to a jury in the Butler County Court of Common Pleas in April 1996.

The trial court granted a directed verdict in favor of Dr. Solomito at the close of appellant's case. The trial court specifically found that Dr. Solomito owed no duty of care toward McKinney because he had never entered into a physician-patient relationship with McKinney. The jury subsequently rendered a verdict in which it found that Dr. Schlatter had not been negligent in her treatment of McKinney. Appellant now appeals, setting forth the following assignments of error:

Assignment of Error No. 1:

"The trial court erred to the prejudice of plaintiff–appellant by granting defendant–appellee Joseph A. Solomito, M.D.'s motion for a directed verdict."

Assignment of Error No. 2:

"The trial court erred to the prejudice of plaintiff-appellant by refusing to allow plaintiff-appellant's expert witness, Geoffrey [sic] M. Graeber, M.D., to give opinion testimony concerning whether defendants-appellees breached the standard of care in their care and treatment of Lanny D. McKinney."

Assignment of Error No. 3:

"The trial court erred to the prejudice of plaintiff-appellant by permitting defendant-appellee Frances C. Schlatter, M.D.'s expert witness, Peter Pavlina, M.D., to give opinion testimony concerning the standard of care in the emergency room."

In her first assignment of error, appellant contends that the trial court erred in granting Dr. Solomito's motion for a directed verdict. Civ.R. 50(A)(4) provides as follows:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

Civ.R. 50(A)(4) requires a trial court to grant a motion for a directed verdict where reasonable minds construing the evidence most strongly in favor of the nonmoving party could come to only one conclusion and that conclusion is adverse to such party. *The Limited Stores, Inc. v. Pan Am. World Airways, Inc.* (1992), 65 Ohio St.3d 66, 73, 600 N.E.2d 1027, 1033; *Crawford v. Halkovics* (1982), 1 Ohio St.3d 184, 185–186, 1 OBR 213, 214–215, 438 N.E.2d 890, 891–893. A directed verdict is appropriate where the party opposing it has failed to adduce sufficient evidence of an essential element of his claim. *Cooper v. Grace Baptist Church of Columbus, Ohio, Inc.* (1992), 81 Ohio App.3d 728, 734, 612 N.E.2d 357, 360–361.

The plaintiff in a medical malpractice wrongful death case bears the burden of establishing (1) the existence of a duty owed by defendant to the decedent, (2) a breach of that duty, and (3) that the breach of duty was the proximate cause of the decedent's death. *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 92, 529 N.E.2d 449, 454–455. The existence of a duty of care, in a case such as this, depends upon whether there was a physician-patient relationship between the decedent and the defendant-physician. *Pena v. Northeast Ohio Emergency Affiliates, Inc.* (1995), 108 Ohio App.3d 96, 113, 670 N.E.2d 268, 279; *Ryne v. Garvey* (1993), 87 Ohio App.3d 145, 155, 621 N.E.2d 1320, 1326–1327. A physician-patient relationship arises out of a consensual contract of employment, express or implied, under which the patient seeks medical assistance and the physician agrees to render treatment. See *Tracy v. Merrell Dow Pharmaceuticals, Inc.* (1991), 58 Ohio St.3d 147, 150, 569 N.E.2d 875, 878–879; *Amer v. Akron City Hosp.* (1976), 47 Ohio St.2d 85, 88, 351 N.E.2d 479.

The issue presented to us is whether a telephone conversation between an attending emergency room physician and an on-call consulting physician with

regard to an emergency room patient creates a physician-patient relationship between the on-call physician and the patient whom the on-call physician does not know, has not spoken with, and has not previously treated. This is an issue of first impression in Ohio.

At the close of appellant's case, Dr. Solomito's counsel moved for a directed verdict. In granting a directed verdict in favor of Dr. Solomito, the trial court specifically found that the telephone conversation between Drs. Schlatter and Solomito did not create a physician-patient relationship between Dr. Solomito and McKinney. The trial court based its decision on several cases from other states, having found no applicable cases from Ohio.

We note at the outset that while a review of the cases relied upon by the trial court and the positions other states have taken on this matter is enlightening and helpful, those cases are not binding on this court, for one or more of several reasons.

The trial court first cited *Hill v. Kokosky* (1990), 186 Mich.App. 300, 463 N.W.2d 265. In *Hill*, the treating physician contacted the defendants-physicians over the phone about the patient's difficult pregnancy. *Id.* at 302, 463 N.W.2d at 266. The defendants gave the treating physician their opinions based on the case history as related to them. *Id.* The Michigan court of appeals first stated that generally, absent a referral, a formal consultation, or other contractual relationship, no physician-patient relationship exists. *Id.* at 303, 463 N.W.2d at 266. The court of appeals characterized the defendants' opinions as mere informal opinions given to a fellow physician and not in the nature of a prescribed course of treatment. *Id.* at 303–304, 463 N.W.2d at 267. The court of appeals then held that under these circumstances, a treating physician's solicitation of another physician's informal opinion did not create a physician-patient relationship. *Id.* It is not clear whether the defendants were on call.

The second case cited by the trial court was *Schendel v. Hennepin Cty. Med. Ctr.* (Minn.App.1992), 484 N.W.2d 803. In *Schendel*, the Minnesota court of appeals held that the record reasonably supported the jury's implicit finding that a physician-patient relationship existed between the patient and neurosurgeons at the county medical center. *Id.* at 808. The record indicated that under the terms of a written contract between the neurosurgeons and the medical center, the neurosurgeons were obligated to provide not only direct patient care, but also guidance and direction to the medical center's resident doctors and interns. *Id.* The court of appeals concluded that this evidence, along with a reasonable inference that a particular neurosurgeon was directly involved in the patient's care, "permitted the jury to conclude that a physician-patient relationship existed" between the neurosurgeons and the patient. *Id.* We note that in the case at

bar, the trial court incorrectly relied on *Schendel* for the proposition that it held there was no physician-patient relationship.

The third case cited by the trial court was *Fought v. Solce* (Tex.App.1991), 821 S.W.2d 218. In *Fought,* the emergency room physician called the orthopedic specialist on call twice to discuss the patient's condition. On both occasions, the orthopedic specialist was asked but declined to come to the hospital and examine the patient. *Id.* at 219. It is not clear what, if anything, the specialist told the emergency room physician with regard to the patient's diagnosis and course of treatment. The Texas court of appeals held that the fact that the specialist volunteered to be on call did not create a physician-patient relationship because the specialist was under no contractual obligation with the hospital to be on call, nor was the specialist required to be on call to maintain staff privileges. *Id.* at 220.

The fourth case cited by the trial court was *St. John v. Pope* (Tex.1995), 901 S.W.2d 420. In *St. John,* the emergency room physician called the internist on call to discuss the patient's condition. The internist, whose area of specialization was not neurology or neurosurgery, recommended that the patient be transferred to another facility. *Id.* at 422. The Supreme Court of Texas held that there was no physician-patient relationship between the internist and the patient because the internist had not directly or indirectly agreed to examine or treat the patient. *Id.* at 424. The Texas court further held that although the internist had listened to the description of the patient's symptoms and had come to a conclusion as to the basis of the patient's condition, he had done so "for the purpose of evaluating whether he should take the case, not as a diagnosis for a course of treatment." *Id.*

Finally, the trial court cited *Reynolds v. Decatur Mem. Hosp.* (1996), 277 Ill.App.3d 80, 214 Ill.Dec. 44, 660 N.E.2d 235. In *Reynolds,* the treating pediatrician called a physician at his home with regard to a patient. The Illinois court of appeals noted that this particular physician often received informal inquiries, for which he did not bill, from other doctors asking questions and seeking suggestions. The court of appeals also noted that the purpose of these inquiries was only to discuss the case. *Id.* at 83, 214 Ill.Dec. at 46, 660 N.E.2d at 237. While it is not clear whether the physician was on call, the foregoing suggests that he was not. The court of appeals held that a "doctor who gives an informal opinion at the request of a treating physician does not owe a duty of care to the patient whose case was discussed." *Id.* at 85, 214 Ill.Dec. at 48, 660 N.E.2d at 239. Since the physician had done nothing more than answer an inquiry from a colleague for which he charged no fee, the court of appeals held that there was no physician-patient relationship.

After thoroughly reviewing the foregoing cases, we find that they are factually distinguishable from the case at bar and that their holdings are inapplicable to the case at bar. Both *Hill* and *Reynolds* involved the solicitation by a patient's treating physician (as opposed to an emergency room physician) of another physician's informal opinion. Both cases were unclear as to whether the consulted physician was on call. In *Fought*, the Texas court of appeals specifically found that there was no physician-patient relationship on the basis that the consulted physician volunteered to be on call and that he was under no contractual obligation with the hospital to be on call, even for staff privileges purposes. Finally, in *St. John*, the Supreme Court of Texas found that since the physician was consulted not for the purpose of giving a diagnosis for a course of treatment but solely for the purpose of whether he should take the case, there was no physician-patient relationship.

In the case at bar, Dr. Solomito was clearly on call when McKinney sought treatment at MRH. Dr. Solomito testified that on that day, he was on call for his cardiology group. Moreover, unlike in *Fought*, there was no evidence that Dr. Solomito volunteered to be on call.

Ralph J. Lach, M.D. ("Lach"), a cardiologist and an expert witness for appellant, testified about hospitals' on call policy as follows:

"But in large institutions, there would be a call list for obstetrics and call list for pediatrics, and a call list for cardiology, et cetera. So then the Emergency Room physician determines whom on that list is to be called according to who's on duty at that particular time. Duty usually runs 8:00 p.m. to 8:00 a.m. or someplace it runs a week at a time that one knows that he's the guy who has to respond to patients who are uncovered in the Emergency Room.

"* * *

"This is a contractual, I'm not a lawyer, but it's a contractual relationship with the hospital. The hospital says here, you can practice in our hospital as a medical staff member, you have to follow the rules and the bylaws, and those bylaws include going to medical records meetings and administering your own medical staff rules and regulations, and taking care of charity patients and being on an Emergency Room call list.

"That's 95 percent of the hospitals in the country, I'm sure, who work that way. Some of this is an agreement that the physician has with the hospital to serve the hospital needs, to cover the uncovered patient in the Emergency Room in exchange for being a member of that staff and having privileges on that staff."

While there was no direct evidence in the case at bar about the specifics of MRH's on-call policy, there was certainly no evidence that the policy did not exist the day McKinney sought treatment. Nor was there any evidence that MRH did

not belong to the ninety-five percent of the hospitals that have an on-call policy as testified by Dr. Lach. Additionally, Dr. Solomito testified that he was on call that day for his cardiology group.

Unlike in *St. John*, Dr. Solomito was not consulted by Dr. Schlatter for the sole purpose of deciding whether he should take the case. Nor was he consulted to simply render an informal opinion about McKinney's condition. Rather, Dr. Solomito was specifically consulted in his capacity of on-call cardiologist to render a diagnosis. Dr. Schlatter testified that she twice called Dr. Solomito as a cardiologist because she thought the pain experienced by McKinney might be cardiac in nature. Dr. Solomito testified that he was consulted by Dr. Schlatter for the purpose of ruling out a heart attack. Dr. Schlatter also testified that before Dr. Solomito ruled out cardiology as the cause of McKinney's condition, she had relayed to Dr. Solomito all the information she had about McKinney, including test results, and that she and Dr. Solomito had discussed each point.

■ We are unable to agree with the trial court that there could never be a physician-patient relationship between an emergency room patient and an on-call physician consulted by the physician who is treating the patient simply because the on-call physician has never directly met, spoken with, or consulted the patient. We find that the lack of direct contact between the patient and the on-call physician does not, in itself, preclude a physician-patient relationship. To find otherwise would allow on-call cardiologists and kindred specialists who, with a duty to do so, provide what one could term "indirect medical care" to escape all liability even after rendering a diagnosis and prescribing a course of treatment. We cannot so find. "Once the physician-patient relationship [is] found to exist, * * * the professional responsibilities and duties exist despite the lack of proximity, or the remoteness, of contact * * *." *Phillips v. Good Samaritan Hosp.* (1979), 65 Ohio App.2d 112, 116, 19 O.O.3d 66, 69, 416 N.E.2d 646, 649. "Therefore, all physicians involved in a case share in the same duties and responsibilities of the primary care physician to the extent of their involvement." *Id.*

We therefore hold, and in doing so are mindful that we are elaborating in the field of medical malpractice, that a physician-patient relationship can exist by implication between an emergency room patient and an on-call physician who is consulted by the patient's physician but who has never met, spoken with, or consulted the patient when the on-call physician (1) participates in the diagnosis of the patient's condition, (2) participates in or prescribes a course of treatment for the patient, and (3) owes a duty to the hospital, staff or patient for whose benefit he is on call. Once an on-call physician who has a duty to the hospital, its staff, or patients is contacted for the benefit of an emergency room patient, and a discussion takes place between the patient's physician and the on-call physician

regarding the patient's symptoms, a possible diagnosis and course of treatment, a physician-patient relationship exists between the patient and the on-call physician.

■ Applying the foregoing three-prong test to the case at bar, and construing the facts in the light most favorable to appellant, we believe that reasonable minds could come to different conclusions as to whether a physician-patient relationship existed between McKinney and Dr. Solomito. Dr. Solomito, who was consulted by Dr. Schlatter for the purpose of ruling out a heart attack, participated in McKinney's diagnosis by ruling out cardiology as the source of McKinney's pain. Dr. Solomito testified that while he did not think McKinney's pain was cardiac in nature after the first telephone conversation, he "felt quite confident" that it wasn't a heart attack after the second telephone conversation. Rather, Dr. Solomito told Dr. Schlatter that McKinney's symptoms sounded gastrointestinal.

Dr. Solomito also participated in McKinney's course of treatment. During the first telephone conversation and after ruling out a heart attack, Dr. Solomito told Dr. Schlatter to repeat the EKG and to look for other causes. Dr. Schlatter testified that during that first conversation, she and Dr. Solomito "went through each point of [her] concerns, about the EKG, about the chest x-rays, about the types of symptoms [McKinney] had." Dr. Schlatter further testified that Dr. Solomito did "not see a reason for [McKinney] to be admitted for cardiac at that time." Dr. Schlatter testified that she relied on Dr. Solomito's advice and comments in pursuing a course of treatment for McKinney.

Following the second telephone conversation, Dr. Solomito again told Dr. Schlatter he did not think McKinney's condition was cardiac in nature. Dr. Solomito testified that he told Dr. Schlatter to continue to evaluate McKinney and that if she was still uncertain as to the cause of McKinney's pain, to call him back. One could argue that Dr. Solomito also participated in McKinney's course of treatment negatively by precluding cardiac treatment and by not suggesting or requesting a CAT scan.

Finally, it is undisputed that Dr. Solomito was on call for his group. As already noted, while there was no direct evidence as to the specifics of MRH's on-call policy, there was also no evidence rebutting the testimony of both Dr. Solomito and Dr. Lach. Dr. Lach testified to the nature of hospital on call requirements and said that ninety-five percent of the hospitals in the country have an on-call policy. Dr. Solomito said he was on call. Dr. Schlatter testified she called him in that capacity. There was no evidence in the case at bar that MRH did not have an on-call agreement with its staff physicians.

In light of all of the foregoing, we therefore find that the trial court erred in granting Dr. Solomito's motion for a directed verdict. Appellant's first assignment of error is well taken and sustained.

In her second assignment of error, appellant contends that the trial court erred in prohibiting her expert witness, Jeffrey Graeber, M.D., a cardiovascular thoracic surgeon, from testifying concerning the standards of care applicable to cardiologists and emergency room physicians. Evid.R. 702 governs the admissibility of expert testimony and provides, in part, as follows:

"A witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

The admissibility of expert testimony is a matter within the sound discretion of the trial court. *Fulton v. Aszman* (1982), 4 Ohio App.3d 64, 66, 4 OBR 114, 116–117, 446 N.E.2d 803, 806–807. A reviewing court must not disturb a trial court's ruling that a witness is not qualified to give expert testimony under Evid.R. 702 unless there has been an abuse of discretion. *Vinci v. Ceraolo* (1992), 79 Ohio App.3d 640, 646, 607 N.E.2d 1079, 1083.

An expert witness in a medical malpractice case "must demonstrate a knowledge of the standards of the school and specialty, if any, of the defendant physician which is sufficient to enable him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards and not to the standards of the witness' school and, or, specialty if it differs from that of the defendant." *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 160, 10 O.O.3d 332, 334, 383 N.E.2d 564, 567; *Hudson v. Arias* (1995), 106 Ohio App.3d 724, 729, 667 N.E.2d 50, 53. The scope of the witness's specialized knowledge, skill, experience, training, or education, and not his classification by title, determines whether he may testify as an expert under Evid.R. 702. *Alexander* at 160, 10 O.O.3d at 334–335, 383 N.E.2d at 567; *King v. LaKamp* (1988), 50 Ohio App.3d 84, 85–87, 553 N.E.2d 701, 702–704.

The record indicates that appellant's counsel properly qualified Dr. Graeber as an expert witness in the field of cardiovascular thoracic surgery. However, there is simply nothing in the record which persuades us that Dr. Graeber has any specialized knowledge, skill, experience, training, or education in cardiology

or emergency medicine. The mere fact that Dr. Graeber has worked with cardiologists and emergency room physicians in the past does not by itself qualify him to render an expert opinion as to the standards of care applicable to physicians who practice medicine in these specialized fields. Accordingly, we find no abuse of discretion by the trial court in precluding Dr. Graeber from testifying to the standards of care applicable to physicians who practice cardiology · or emergency medicine. Appellant's second assignment of error is overruled.

In her third assignment of error, appellant contends that the trial court abused its discretion in permitting Dr. Schlatter's expert witness, Peter Pavlina, M.D., a cardiovascular thoracic surgeon, to testify as follows:

"*Q:* Was this patient stable when the patient was discharged from the hospital, based on your review of the medical records?

"*A:* Correct.

"*Q:* And based upon your review of the medical records, was there anything in this particular case and the physical findings, lab results, everything that transpired during this Emergency Room visit from a cardiothoracic standpoint, that would require a [CAT] scan to be done at any time?

"*MR. HOLSCHUH:* Objection.

"*THE COURT:* Overruled.

"*A:* No, there was nothing there that would require a CAT scan be done."

Our review of the record indicates that Dr. Schlatter offered the above-quoted testimony by Dr. Pavlina to rebut earlier testimony by appellant's own expert witness, Dr. Graeber, that a CAT scan was necessary to diagnose McKinney's condition. Dr. Pavlina's testimony was both relevant and admissible for this purpose. See Evid.R. 401. Therefore, we find no error by the trial court in admitting Dr. Pavlina's testimony. Appellant's third assignment of error is overruled. The judgment of the trial court is hereby affirmed in part and reversed in part, and the cause is remanded to the trial court.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

KOEHLER, J., concurs in part and dissents in part.

POWELL, J., concurs in part and dissents in part.

KOEHLER, Judge, concurring in part and dissenting in part.

I believe the on-call cardiologist, Dr. Solomito, by rendering advice to the primary physician, became a party to the physician-patient relationship, and

therefore the first assignment of error was well taken. The evidentiary questions raised by appellant likewise have merit. Accordingly, I dissent from the holding on the second and third assignments of error.

POWELL, Judge, concurring in part and dissenting in part.

I agree with the majority's analysis of the second and third assignments presented by this appeal. However, I believe that the trial court properly granted Dr. Solomito's motion for a directed verdict. Therefore, I must respectfully dissent from the majority's decision to sustain appellant's first assignment of error and remand this case to the trial court.

The majority correctly reasons that the existence of a duty in a wrongful death medical malpractice case depends upon whether a physician-patient relationship existed between the decedent and the defendant-physician. I further agree that an implied physician-patient relationship may arise between an emergency room patient and an on call specialist where the on-call specialist is contractually bound to consult with the attending emergency room physician for the patient's benefit. Nevertheless, I am not persuaded that a jury could conclude that such a relationship existed in this case because there is no evidence with respect to whether Dr. Solomito was contractually obligated to consult with Dr. Schlatter or other MRH physicians regarding McKinney's condition.

The majority points to the testimony of appellant's expert witness, Dr. Ralph Lach, as evidence of Solomito's contractual obligations as the on-call cardiologist. Dr. Lach testified that a contractual relationship typically exists between a hospital and it staff physicians under which the physician is required to obey hospital bylaws, attend medical records meetings, treat charity patients, and be on an emergency room call list. However, neither Dr. Lach nor any of appellant's other witnesses offered any evidence as to whether such an arrangement exists at MRH under which Dr. Solomito was contractually required to consult with Dr. Schlatter for McKinney's benefit.

Absent such evidence, there is simply no way the jury could have reasonably concluded that an implied physician-patient relationship existed between Dr. Solomito and McKinney. The jury would be left to speculation. Therefore, I must dissent from the majority's decision to sustain appellant's first assignment of error because I believe that the trial court properly granted Dr. Solomito's motion for a directed verdict under these circumstances.