## A99A1112. ANDERSON v. HOUSER.
### (523 SE2d 342)

RUFFIN, Judge.

Mariam Anderson was admitted to the Southwest Hospital emergency room on February 29, 1996, for a suspected drug overdose. On March 1, 1996, she was discharged and transferred to Georgia Regional Hospital. She later sued Southwest Hospital and several physicians, including Dr. John W. Houser, for medical malpractice, alleging that they negligently failed to diagnose an esophageal perforation. Although not specified in her complaint, she also contended that the hospital transferred her to Georgia Regional Hospital when she was not stable. Dr. Houser never met or treated Anderson and was out of town during her hospital stay. However, Anderson contended that Dr. Houser owed her a duty of care because he was the scheduled on-call physician when she was admitted to the emergency room. The trial court granted summary judgment to Houser, holding that he owed Anderson no duty because there was no physician-patient privity. For reasons discussed below, we affirm.

To prevail on a motion for summary judgment,

> the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A *defendant* may do this by showing the court that the documents, affidavits, depositions[,] and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. . . . If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.[1]

Dr. Houser testified that he was an attending physician on the staff of Southwest Hospital. In February 1996, Dr. Houser was listed as an on-call physician for family practice at the hospital. The hospital bylaws required staff members to provide on-call services for patients who came to the emergency room without a physician. The

---

[1] (Emphasis in original.) *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

hospital would distribute a schedule listing the days each doctor was assigned on-call duty. On any given day, one doctor would be the designated on-call doctor for family practice patients. Dr. Houser testified that, if a doctor was unable to be on call when scheduled, it was his responsibility to find someone to take his place. However, Dr. Houser also testified that "the hospital bylaws provides for a redundant system. In other words, if I'm not available, there's someone else; and if that person is not available, there's somebody else. But on the schedule, there's only one name." Another doctor, Dr. Frank Cook, testified that

> there's a chain of command that is supposed to be followed [when an on-call doctor is unavailable]. There are rules and regs governing according to the medical staff bylaws, that there are certain steps you go through if you can't find the attending physician. . . . They go to the person's partner or associate, number one. If there is not or if that's not available, they go to the chief of the service. If that person is not available, they go to the chief of staff. If that person is not available, they go to the hospital administrator.

Dr. David Blake testified that, if a resident is unable to contact the on-call family practice doctor, there is a family practice attending physician on call at all times to whom he could turn for assistance.

Dr. Houser admitted that he was the scheduled on-call family practice physician from 8:00 a.m. on February 29, 1996, until 8:00 a.m. on March 1, 1996, during which time Anderson was admitted to the emergency room. He also admitted that he was out of town during this period, but claimed that he arranged for Dr. Cook to cover for him. Dr. Cook denied that he agreed to cover for Dr. Houser on February 29, when Anderson was admitted, claiming that his coverage period was not to begin until March 1.

Dr. Cook testified that he did not receive any medical information or give any advice regarding Anderson during her hospital stay. However, Dr. Shaun Brownlee, a resident who treated Anderson at the hospital, testified that he consulted with Dr. Cook regarding Anderson's treatment after learning that Dr. Houser was out of town. Dr. Brownlee testified that, although Dr. Cook said he was not supposed to start covering for Dr. Houser until the weekend, he nevertheless agreed to let Dr. Brownlee present Anderson's case to him. According to Dr. Brownlee, Dr. Cook approved his suggested orders and gave him additional orders for treatment. Dr. Brownlee testified that there was no doubt in his mind that Dr. Cook was available throughout the remainder of his shift for consultation regarding Anderson. Dr. Cook, however, testified that he told Dr. Brownlee he

was not covering for Dr. Houser and that he refused to provide any input as to Anderson's diagnosis or treatment. Nurse Sarah Hardy testified that Dr. Cook personally authorized Anderson's transfer to Georgia Regional Hospital, although Dr. Cook denied doing so. The trial court found that the evidence was conflicting as to whether Dr. Houser had properly arranged for a substitute on-call physician and assumed for summary judgment purposes that Dr. Houser did not make proper arrangements.

1. The sole question on appeal is whether Dr. Houser owed Anderson a duty of care, even though he never met Anderson, was never consulted about her condition, and was not aware of her existence. In considering this issue, we must start from the

> well-settled principle of Georgia law that there can be no liability for malpractice in the absence of [a] physician-patient relationship. . . . [D]octor-patient privity is essential because it is this relation which is a result of a consensual transaction that establishes the legal duty to conform to a standard of conduct. *Bradley Center v. Wessner*, 250 Ga. 199 (296 SE2d 693) (1982). The relationship is considered consensual where the patient knowingly seeks the assistance of the physician and the physician knowingly accepts him as a patient.[2]

The parties do not cite, and we are not aware of, any Georgia cases dealing with the precise issue in this case. However, cases in other jurisdictions have taken differing approaches to determining when an on-call doctor may be liable for failing to provide services to a patient he has never met. In *Hiser v. Randolph*,[3] after a patient with acute diabetes arrived at the emergency room in a semi-comatose condition, the emergency room nurse contacted the on-call physician, Dr. Randolph. Dr. Randolph refused to attend or treat the patient and advised the nurse to call Dr. Arnold, the patient's regular physician, who had treated her in the emergency room the day before. The nurse subsequently advised Dr. Randolph that Dr. Arnold would not come to the hospital, and Dr. Randolph again refused to attend the patient. The patient died the next day, and her husband later sued Dr. Randolph for malpractice.

In reversing a grant of summary judgment in favor of Dr. Randolph, the Arizona Court of Appeals held that he had a duty to treat the emergency room patient. The court noted that (1) state law

---

[2] (Citations and punctuation omitted.) *Peace v. Weisman*, 186 Ga. App. 697, 698 (1) (368 SE2d 319) (1988)

[3] 126 Ariz. 608 (617 P2d 774) (Ariz. App. 1980).

required a hospital providing emergency room services to provide those services to everyone in need of them; (2) the hospital's bylaws stated a purpose that "all patients . . . treated in the Emergency Room receive the best possible care"; (3) the hospital's rules and regulations stated that "[i]n case of emergency [a] provisional diagnosis shall be stated as soon after admission as possible"; (4) all members of the medical staff were required to sign the bylaws and rules and regulations; and (5) Dr. Randolph was paid $100 per day to be the doctor on call in charge of the emergency room.[4] Although the court recognized the general rule that a doctor can refuse to treat a patient even in emergency situations,[5] it held that

> [i]n our opinion, Dr. Randolph, by assenting to these bylaws, and rules and regulations, and accepting payment from the hospital to act as the emergency room doctor "on call," personally became bound "to insure that all patients . . . treated in the Emergency Room receive the best possible care," and agreed to insure "in the case of emergency the provisional diagnosis shall be started as soon after admission as possible." . . . [T]he obviously intended effect of the bylaws and rules and regulations was to obligate the emergency room doctor "on call" to provide emergency treatment to the best of the doctor's ability to any emergency patient of the hospital. Under these circumstances, the lack of a consensual physician-patient relationship before a duty to treat can arise has been waived by the signatory doctors.[6]

The court in *Hiser* did not address whether the patient was an intended third-party beneficiary of the contract between the hospital and Dr. Randolph so as to create a doctor-patient relationship. Nor did it hold that there *was* a consensual doctor-patient relationship between the patient and Dr. Randolph. Rather, it held that by agreeing to the hospital's bylaws and rules and regulations, Dr. Randolph assumed a duty to treat emergency room patients notwithstanding the lack of a consensual doctor-patient relationship.[7]

The Ohio Court of Appeals took a different approach to this issue in *McKinney v. Schlatter*.[8] In that case, the patient's emergency room doctor telephoned an on-call cardiologist and described the patient's x-ray, electrocardiogram, and other test results. The cardiologist said

---

[4] Id. at 611.
[5] Id. at 610.
[6] Id. at 611-612.
[7] Id.
[8] 118 Ohio App.3d 328 (692 NE2d 1045) (1997).

that he did not believe the patient's problem was cardiac in nature and suggested that the emergency room doctor repeat the electrocardiogram. After the patient died of an aortic aneurysm, his executor sued the on-call cardiologist and others for malpractice. The Ohio Court of Appeals held that

> a physician-patient relationship can exist by implication between an emergency room patient and an on-call physician who is consulted by the patient's physician but who has never met, spoken with, or consulted the patient when the on-call physician (1) participates in the diagnosis of the patient's condition, (2) participates in or prescribes a course of treatment for the patient, and (3) owes a duty to the hospital, staff or patient for whose benefit he is on call. Once an on-call physician who has a duty to the hospital, its staff, or patients is contacted for the benefit of an emergency room patient, and a discussion takes place between the patient's physician and the on-call physician regarding the patient's symptoms, a possible diagnosis and course of treatment, a physician-patient relationship exists between the patient and the on-call physician.[9]

Applying this three-prong test, the Court of Appeals held that the trial court erred in granting the on-call doctor's motion for directed verdict.[10]

The Michigan Court of Appeals considered a similar situation in *Oja v. Kin*.[11] The facts in that case were similar to those in *McKinney*, except that the on-call physician, when contacted on several occasions by the resident on duty, refused to offer any assistance and suggested that the resident should contact another doctor for assistance. The Court of Appeals expressed approval of *McKinney*'s recognition that "a physician's on-call status alone is insufficient to warrant a finding that the physician impliedly consented to a physician-patient relationship."[12] The court then went on to analyze the issue as follows:

> A physician-patient relationship is contractual and requires the consent, express or implied, of both the doctor and the patient. The consent of the patient is generally implied. The question is, [u]nder what circumstances can the doctor's con-

---

[9] Id. at 336-337.
[10] Id. at 337-338.
[11] 229 Mich. App. 184 (581 NW2d 739) (1998).
[12] Id. at 190.

sent be implied? . . . [M]erely listening to another physician's description of a patient's problem and offering a professional opinion regarding the proper course of treatment is not enough. Under those circumstances, a doctor is not agreeing to enter into a contract with the patient. Instead, she is simply offering informal assistance to a colleague. At the other end of the spectrum, a doctor who is on call and who, on the phone or in person, receives a description of a patient's condition and then essentially directs the course of that patient's treatment, has consented to a physician-patient relationship. The difficulty arises in determining where, between these two extremes, a physician-patient relationship (and thus a duty) arises. This inquiry is necessarily conducted case by case, but we do not believe that a physician's on-call status alone is enough to support an implied consent to a physician-patient relationship. Thus, we conclude that an implied consent to a physician-patient relationship may be found only where a physician has done something, such as participate in the patient's diagnosis and treatment, that supports the implication that she consented to a physician-patient relationship. We conclude that such participation is necessary for, but by itself does not establish, an implied physician-patient relationship.[13]

The court in *Oja* held that, because the on-call physician did not provide any care, treatment, or advice regarding the patient's condition, he did not consent to the creation of a physician-patient relationship.[14] In so holding, the court rejected the contention that the physician's contract with the hospital created such a relationship:

Plaintiff argues that Dr. Kin's contractual relationship with the hospital, combined with the hospital by-laws, imposed a duty on Dr. Kin to come to the hospital when he was called, or to arrange for coverage. Dr. Kin may very well have owed such a duty to the hospital. However, a contract between the hospital and Dr. Kin does not necessarily create rights in third-parties such as the decedent.[15]

The court rejected the proposition that the patient was an intended third-party beneficiary of the contract between the hospital and the on-call physician, noting that under Michigan law, "[w]here the con-

---

[13] (Citations and footnotes omitted.) Id. at 190-191.
[14] Id. at 192.
[15] Id.

tract in question is primarily for the benefit of the parties thereto, the fact that a third person is incidentally benefited does not give that person rights as a third-party beneficiary."[16]

We believe that the approach taken in *Oja* is the preferable approach. Georgia law clearly provides that no duty can arise in the absence of a consensual doctor-patient relationship.[17] A consensual relationship is established when "the patient knowingly seeks the assistance of the physician and the physician knowingly accepts him as a patient."[18] As *Oja* recognized, an individual presenting herself to the emergency room may generally be assumed to have consented to treatment by any physician associated with the hospital who offers such treatment. Therefore, the key question in determining the existence of a doctor-patient relationship is whether the physician has knowingly accepted such individual as his patient.

Although a doctor who has agreed to be on-call makes himself available to be consulted regarding a patient's condition, that fact alone does not indicate that the doctor has agreed to establish a doctor-patient relationship with any patient who presents herself to the hospital for diagnosis and treatment. Indeed, there may be many circumstances where an on-call physician who is consulted about a particular patient does not feel competent to diagnose and treat the patient. Clearly, in those circumstances, the mere fact that the doctor has agreed to be on call for consultation does not establish a consensual doctor-patient relationship.

Although the issue becomes more complicated when the doctor has a contract or agreement with the hospital requiring him to be on call during a certain period, we do not believe this fact necessarily implies the existence of a consensual relationship between the doctor and any patient who presents herself at the hospital. The issue is not whether the doctor has a duty to the hospital, but whether he has a duty to the patient. It is axiomatic that one who is not a party to a contract has no standing to enforce the contract unless she is an intended third-party beneficiary thereof.[19] Clearly, therefore, a patient cannot rely on a contract between a doctor and a hospital to create a consensual relationship between herself and the doctor, unless she is an intended third-party beneficiary of the contract with enforceable rights thereunder.

OCGA § 9-2-20 (b) provides that "[t]he beneficiary of a contract made between other parties for his benefit may maintain an action

---

[16] Id. at 193.

[17] See *Bradley Center*, supra at 201.

[18] (Citation and punctuation omitted.) *Peace*, supra.

[19] See OCGA § 9-2-20 (b); *Culberson v. Fulton-DeKalb Hosp. Auth.*, 201 Ga. App. 347, 349 (1) (d) (411 SE2d 75) (1991).

against the promisor on the contract." However,

> [i]n order for a third party to have standing to enforce a con-
> tract under OCGA § 9-2-20 (b) it must clearly appear from
> the contract that it was *intended* for his or her benefit. The
> mere fact that the third party would benefit from perfor-
> mance of the agreement is not alone sufficient.[20]

In this case, there is no evidence that any agreement between
Dr. Houser and the hospital requiring him to provide on-call services
was intended for the benefit of the patient as opposed to the hospi-
tal.[21] Although a patient admitted to an emergency room may expect
that the hospital has made adequate staffing arrangements to pro-
vide necessary emergency room services, she does not have any rea-
son to expect that any particular doctor will provide treatment. To
the extent that a hospital is required to provide emergency services
to patients, the precise manner in which it chooses to meet its staff-
ing needs is an administrative matter for the hospital. In this case,
although the hospital required staff members to serve specified peri-
ods on call, it also provided a redundant system in the event the
scheduled on-call doctor could not be reached. In other words, the
system put in place by the hospital allowed emergency room physi-
cians to obtain the necessary consultations whether or not the sched-
uled on-call doctor was available. The existence of this redundant
system shows that the practice of designating a particular doctor to
be on call for a particular day was intended for the benefit of the hos-
pital and was not intended to give a patient an enforceable right to be
diagnosed or treated by any particular doctor. The fact that the sys-
tem may not have functioned properly in this particular case does not
change the result, since what is important is the intent of the con-
tracting parties.[22]

The potential ramifications of imposing liability upon an on-call
doctor under the circumstances in this case are far-reaching. There
would be no logical reason to limit such a holding to situations

---

[20] (Citation and punctuation omitted.) Id.

[21] See *Oja*, supra. Although Dr. Houser admitted that the hospital bylaws required doc-
tors to perform on-call services, the bylaws themselves are not in the record on appeal.

[22] Anderson's reliance on *Henry v. Barfield*, 186 Ga. App. 423 (367 SE2d 289) (1988) is
misplaced. In that case, we held that a doctor who had an employment duty to treat an
emergency room patient did not qualify as a "volunteer" so as to be entitled to immunity
under the Good Samaritan statute, OCGA § 51-1-29. We noted that "Good Samaritan stat-
utes are directed at persons, including physicians, who *by chance and on an irregular basis*
come upon or are called upon to render emergency care." (Emphasis in original.) Id. at 424
(1). That case did not deal with the issue of whether an employment duty alone can create a
consensual doctor-patient relationship in the absence of any contact between the doctor and
the patient. See also *Clayton v. Kelly*, 183 Ga. App. 45 (357 SE2d 865) (1987).

involving on-call doctors. Suppose a neurologist on staff is required by the terms of his agreement with the hospital to provide consultations when requested by another physician, but is late returning from lunch one day. Another doctor seeking a consultation is unable to locate the neurologist and consults a different physician who incorrectly diagnoses the patient's condition. Can the patient sue the neurologist for malpractice, claiming that she had a consensual doctor-patient relationship with him by virtue of his employment agreement with the hospital? Although such a result would appear absurd, there is no principled way to distinguish it from the on-call scenario.

Because there is no evidence that Anderson was an intended third-party beneficiary of any on-call agreement between Dr. Houser and the hospital, the trial court correctly concluded that the on-call agreement did not give rise to a consensual doctor-patient relationship between Dr. Houser and Anderson.[23]

2. Dr. David Blake, a third-year resident at the hospital, testified that on occasion Dr. Houser would ask him to visit his patients at the hospital when Dr. Blake was off duty and Dr. Houser was unavailable. Dr. Houser would pay Dr. Blake a fee for visiting his patients. Dr. Blake testified that, because he was not an attending physician and could not admit or discharge patients, he could not be the sole physician responsible for covering for Dr. Houser. Rather, he would visit Dr. Houser's patients to assist whoever was covering for Dr. Houser. He testified that

> I would be there as sort of a conduit to make it easier on his attending colleague who would be providing the absolute coverage for the patient in that I would come in and do the legwork. I would see the patient, write notes. If I had questions, I would then put out a call to whomever he told me would be covering for him on the attending level.

---

[23] We note that, in accordance with hospital procedure, Anderson was admitted to the hospital under Dr. Houser's name because he was listed as the on-call physician at the time she was admitted. However, Anderson does not argue in her brief that this affects the analysis of whether Dr. Houser in fact voluntarily accepted Anderson as his patient, but argues simply that his employment duty to provide on-call services obligated him either to attend to any patient who came to the emergency room without a physician or to arrange for a qualified substitute. To the extent that this issue may have been implicitly suggested in Anderson's supplemental brief, we note that "[i]ssues not argued and supported with citation of authority in the original brief cannot be 'resurrected from abandonment' by a supplemental brief." *Jewell v. State*, 200 Ga. App. 203, 205 (3) (407 SE2d 763) (1991). See also *Williams v. State*, 168 Ga. App. 614, 615 (4) (309 SE2d 856) (1983); *In re Harvey*, 219 Ga. App. 76, 79 (464 SE2d 34) (1995). Because this issue was not properly asserted by Anderson as a basis for reversal, and thus Dr. Houser did not have an opportunity to present counterargument in his response brief, we limit our consideration to those issues properly raised in Anderson's original brief.

Anderson contends that, if Dr. Blake covered for Dr. Houser in connection with her treatment, then he must be considered Dr. Houser's agent or employee, rendering Dr. Houser liable for his actions. However, there is no evidence that Dr. Blake in fact ever treated Anderson. Dr. Blake testified that he did not recall treating Anderson, and Anderson's hospital records do not indicate that he was involved in any way with her treatment. The only evidence of any involvement by Dr. Blake with Anderson is that he refused to sign her discharge papers when summoned by another resident who believed he was covering for Dr. Houser.[24] Because there is no evidence that Dr. Blake took part in Anderson's care or treatment, Anderson has not shown how his relationship with Dr. Houser has any relevance to the issue of Dr. Houser's duty to Anderson.

*Judgment affirmed. McMurray, P. J., and Andrews, P. J., concur.*

DECIDED OCTOBER 6, 1999 —
RECONSIDERATION DENIED NOVEMBER 2, 1999 — ■■■■■■■■

*Williams & Henry, Philip C. Henry, Robert L. Callahan III, Edward C. Henderson, Jr.,* for appellant.

*Sistrunk & Associates, Hezekiah Sistrunk, Jr., Michael S. Bailey,* for appellee.

---

[24] This resident, Dr. James Everett, testified that after Dr. Blake refused to sign the discharge papers, a nurse telephoned Dr. Cook, who authorized Anderson's discharge and transfer. The nurse, Sarah Hardy, testified that Dr. Cook authorized Anderson's transfer over the telephone.