**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**October 30, 2012**

# In the Court of Appeals of Georgia

A12A1872. GAULDEN et al. v. GREEN et al.

BARNES, Presiding Judge.

Following the death of Deloris P. Gaulden in the emergency room of Liberty Regional Medical Center ("LRMC"), her daughter, individually and as administratrix of her estate, brought this wrongful death and survival action against several defendants, including Bobby L. Herrington, M.D., the Medical Director of the LRMC Emergency Department.[1] The trial court granted summary judgment to Dr. Herrington

---

[1] The other individual defendants were Dr. Daniel Green, M.D., the physician who treated the decedent in the emergency room; Stuart E. Mauney, R.N., the nurse assigned to the decedent; and Debra Hall Carter, R.N., the charge nurse on duty at the time of the decedent's presentation and treatment. Several corporate entities also were named as defendants: The Hospital Authority of Liberty County d/b/a LRMC; the Schumacher Group of Delaware, Inc. d/b/a Scuhmacher Group; Liberty Emergency Group, LLC; Schumacher Medical Corporation; and Schumacher Management Services, Inc.

on the plaintiff's claim for professional negligence on the ground that he had no physician-patient relationship with the decedent and owed no legal duty to her. The trial court subsequently granted summary judgment to Dr. Herrington on the plaintiff's claim for ordinary negligence on the ground that all of the allegations against him sounded in professional negligence. For the reasons discussed below, we affirm the trial court grant of summary judgment on the ordinary negligence claim. However, we conclude that Dr. Herrington owed a legal duty to the decedent based upon the specific supervisory responsibilities that he assumed over the emergency room staff in agreeing to serve as Medical Director, and, therefore, reverse the trial court's grant of summary judgment on the professional negligence claim.

Summary judgment is proper if, and only if, the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). See *Ly v. Jimmy Carter Commons, LLC*, 286 Ga. 831, 833(1) (691 SE2d 852) (2010). On appeal from the grant of summary judgment, we view the evidence de novo, with the facts and all inferences drawn from them viewed in the light most favorable to the nonmoving party. *McCaskill v. Carillo*, 263 Ga. App. 890 (589 SE2d 582) (2003).

2

So viewed, the record shows that on October 17, 2008, the 64-year-old decedent was transported by ambulance to the LRMC Emergency Department after becoming dizzy and fainting at church. En route to the hospital, the decedent informed the paramedic who was riding in the ambulance that she had a history of hypertension and hypercholesterolemia. She also complained of "chest tightness," which the paramedic reported to emergency room staff by phone on the way to the hospital and in-person once the ambulance arrived there.

The decedent was received by staff in the emergency room at 1:47 p.m. Despite her repeated complaints of chest pain following her arrival, she did not receive an anticoagulant (i.e., aspirin) until 2:45 p.m. The first 12-lead electrocardiogram ("EKG") of the decedent, which showed that she was likely suffering from a heart attack, was not performed until 2:58 p.m. Following the EKG, the decedent went into cardiac and respiratory arrest, and the emergency room staff called an emergency code and began CPR at 3:19 p.m. Efforts were made to revive the decedent until 6:05 p.m., when she was pronounced dead.

The administratrix of the decedent's estate subsequently commenced this wrongful death and survival action against multiple defendants, alleging that the failure to properly triage, diagnose, and treat the decedent in the emergency room

3

caused her untimely death from a sudden cardiac event. The complaint and accompanying expert affidavits alleged that if Dr. Daniel Green (the emergency room physician who had treated the decedent), had properly recognized the decedent's symptoms of a heart attack, and if Dr. Green and Stuart Mauney (the registered nurse assigned to the decedent in the emergency room), had immediately and properly implemented the hospital's "Chest Pain Standing Orders" in response to those symptoms, the decedent would not have died from her cardiac condition.

The complaint also named as a defendant Dr. Herrington, the Medical Director of the LRMC Emergency Department. Dr. Herrington was not present or physically involved in the care and treatment of the decedent the day she presented and died at the hospital. However, according to the complaint and the expert physician's affidavit attached to it, Dr. Herrington breached his specific supervisory duties as Medical Director and was negligent in failing to take adequate steps to ensure that emergency room staff (including Dr. Green and Nurse Mauney) were properly trained on the existence of and proper implementation of Emergency Department policies and protocols, including the "Chest Pain Standing Orders."

Dr. Herrington filed a motion for summary judgment, contending that the evidence did not support a claim of professional negligence against him because he

4

did not have a physician-patient relationship with the decedent and owed no legal duty to her. The trial court granted the motion, but reserved ruling on any claims asserted against Dr. Herrington for ordinary negligence. Dr. Herrington then filed a second motion for summary judgment as to any claim for ordinary negligence, asserting that the uncontroverted evidence showed that his duties in supervising the Emergency Department involved medical questions demanding the exercise of professional judgment and skill, such that the claims against him fell outside the realm of mere ordinary negligence. The trial court granted the second motion for summary judgment, leading the plaintiff to file this appeal.

1. The plaintiff challenges the trial court's order granting summary judgment to Dr. Herrington on the professional negligence claim. In seeking summary judgment, Dr. Herrington argued that the uncontroverted evidence showed that no physician-patient relationship existed between him and the decedent, and thus that no legal duty was owed by him to her. The plaintiff asserts that the trial court's order can be affirmed only if it is true that "claims of professional negligence can never stand against a physician who does not establish a direct, in-person doctor-patient relationship." According to the plaintiff, Dr. Herrington owed a legal duty to the decedent based on the explicit, written duties set forth in his contract to serve as

5

Medical Director, "as well as those implied through his position as Director of the Emergency Department." We agree with the plaintiff that summary judgment on the professional negligence claim was inappropriate under the particular facts of this case.

To maintain a claim for professional negligence, "a plaintiff must prove the following elements: (1) a legal duty to conform to a standard of conduct; (2) a breach of this duty; (3) a causal connection between the conduct and the resulting injury; and (4) damage to the plaintiff." (Punctuation and footnote omitted.) *Pattman v. Mann*, 307 Ga. App. 413, 417 (701 SE2d 232) (2010). "In the absence of a legally cognizable duty, there can be no fault or negligence." *Ford Motor Co. v. Reese*, 300 Ga. App. 82, 84 (1) (a) (684 SE2d 279) (2009).

In a "classic" medical malpractice case, the plaintiff must come forward with evidence of a physician-patient relationship to succeed on a claim of professional negligence against the physician. See *Medical Center of Central Ga. v. Landers*, 274 Ga. App. 78, 84 (1) (b) (616 SE2d 808) (2005); *Peace v. Weisman*, 186 Ga. App. 697, 698 (1) (368 SE2d 319) (1988). "In such cases, . . . doctor-patient privity is essential because it is this relation which is a result of a consensual transaction that establishes

6

the legal duty to conform to a standard of conduct." (Citation omitted.) *Landers*, 274 Ga. App. at 84 (1) (b).

Privity is not required, however, if there is some independent basis for the existence of a legal duty – apart from the "consensual transaction" between physician and patient – that arises out of the unique circumstances of the case. See *Bradley Center v. Wessner*, 250 Ga. 199, 201-203 (1) (296 SE2d 693) (1982) (plurality opinion). This follows from the general principle that "[a] breach of different duties . . . gives rise to separate and distinct claims." (Citations and punctuation omitted.) *Blier v. Greene*, 263 Ga. App. 35, 39 (2) (587 SE2d 190) (2003).

Under Georgia law, the failure to adequately supervise emergency room staff "can result in liability for any damages resulting from such failure by one whose responsibility it is to provide such supervision." *Gray v. Vaughn*, 217 Ga. App. 872, 874 (1) (460 SE2d 86) (1995) (defendant "was contractually obligated to provide supervision of the triage nurses" and could be held liable for injury to patient resulting from failure to supervise them properly). There is evidence in the record that Dr. Herrington, in serving as Medical Director of the LRMC Emergency Department, assumed an independent duty to supervise and monitor the training of emergency room physicians and nursing staff to ensure that they were adequately informed of

7

and knowledgeable about the existence of and proper implementation of Emergency Department policies and protocols, including the "Chest Pain Standing Orders" at issue in this case. Given this independent duty, the plaintiff was not required to prove that a physician-patient relationship existed between Dr. Herrington and the decedent.

Specifically, the record reflects that since August 2000, Dr. Herrington has worked as a staff physician in the LRMC Emergency Department. Beginning in June 2008, he also assumed the role of Medical Director of the LRMC Emergency Department in return for additional compensation, termed a "Medical Director Stipend," and signed an agreement entitled "Medical Director Agreement-Emergency Department." (the Medical Director Agreement")[2] Under the Medical Director Agreement, Dr. Herrington agreed to "substantially perform and carry out the typical duties of a dedicated, fully functional Medical Director of an Emergency Department," including a list of duties included on an attached Exhibit A, entitled "Medical Director Responsibilities," which was incorporated into the agreement. Exhibit A included several categories of responsibilities, including but not limited to

_____

[2] The Medical Director Agreement was entered into between Dr. Herrington and Liberty Emergency Group, LLC, the company that staffed LRMC with physicians.

"Monitor and Supervise Physicians" and "Monitor and Supervise Department Functions."

Some of the specific responsibilities assigned to Dr. Herrington as Medical Director and listed in Exhibit A included: "Acts as a liaison with the hospital medical staff, administration and emergency department staff to assure support of department"; "Interact with ancillary services (lab/x-ray, nursing, respiratory therapy, medical records) to insure efficient work flow between emergency department and these services"; "Work towards insuring quality patient care"; "Review and be familiar with policies/procedures relevant to the ED Physicians . . . ;" and "Contribute to or assist with education of ED staff and provide direction to ED nursing staff." Additionally, Dr. Herrington, in his "function as Medical Director," agreed "to insure that the physicians . . . [in the Emergency Department] are providing emergency medical physician staffing and management services . . . in accordance with the policies and regulations of the Hospital, and under currently approved and acceptable standards of care prevalent in the Hospital's area."

In his deposition, Dr. Herrington testified that the LRMC Emergency Department had seven or eight "standing orders" in place in 2008 that provided a list of measures that could be taken by emergency room nurses without a physician's

order or approval. He further testified that as Medical Director, he had reviewed some of the standing orders and had periodic discussions with the Nursing Director about issues pertaining to them, such as any recommended changes. He noted that meetings were held to disseminate information about the standing orders, and that he would assist in advising emergency room physicians and staff about any changes to hospital policies and procedures that affected how the Emergency Department functioned.

According to Dr. Herrington, he also provided "one-on-one mentoring" to emergency room physicians "when needed" to address new procedures and played a role in ensuring that they were knowledgeable of pertinent policies and protocols. In addition to his role in educating emergency room physicians, Dr. Herrington would periodically attend nurse staffing meetings where he would answer questions, and he would "work with the nurses directing their care," which had an education component to it as well. Additionally, Dr. Herrington testified that he would provide direction to the nursing staff if they had "any issues with a specific process" used in the Emergency Department and would discuss such matters with the Nursing Director.

One of the specific protocols or standing orders in the Emergency Department was the "Chest Pain Standing Orders." Dr. Herrington testified that the current version of the Chest Pain Standing Orders was adopted by the nursing staff around

10

the time that he became Medical Director and that it remained in effect at the time of the decedent's treatment in the emergency room.

According to Dr. Herrington, the Chest Pain Standing Orders authorized a nurse in the emergency room to implement a series of listed measures of their own accord without the approval of a physician, including having a 12-lead EKG performed on a patient. In particular, he testified that the Chest Pain Standing Orders authorized an emergency room nurse, when presented with a patient complaining of acute chest pain,[3] to immediately order a "stat" EKG on their own initiative or perform it themselves on the patient if necessary. The goal, as related by Dr. Herrington, was to have the EKG performed within 10 minutes of the patient's presentation in the emergency room to prevent potential damage to the patient's cardiac muscle and to inform the emergency room staff "as quickly as possible" if the patient was suffering from myocardial ischemia and/or a myocardial infarction (i.e., a heart attack).

Dr. Herrington testified, however, that he did not know whether all of the emergency room physicians and nursing staff were aware that a nurse could initiate an order for an EKG under the Chest Pain Standing Orders without first obtaining a

---

[3] Dr. Herrington clarified that by "acute," he meant "recent onset."

11

physician's approval. Indeed, Nurse Mauney, the nurse assigned to the decedent in the emergency room, testified by way of deposition that he believed that the Chest Pain Standing Orders could only be instituted by a nurse upon approval of a physician.[4]

There also was some evidence of confusion among emergency room staff over whether the nurses themselves (versus other hospital personnel such as respiratory therapists) could perform an EKG if necessary under the Chest Pain Standing Orders. This confusion is reflected in the testimony of Dr. Green (who treated the decedent in the emergency room) that in October 2008 he "had no idea what the rules, criteria, or training were of any of the nursing staff with respect to EKGs" and did not know what the hospital policy was on that issue.

Based on this record, there was evidence that Dr. Herrington assumed an obligation as Medical Director to supervise and monitor the training of emergency room physicians and nursing staff on hospital policies and procedures, including the

---

[4] In contrast, later in his deposition, Nurse Mauney testified that under certain circumstances the Chest Pain Standing Orders could be initiated by an emergency room nurse without prior physician approval. At the summary judgment stage, "contradictory testimony must be construed in favor of the non-movant." (Citation and punctuation omitted.) *McCoy v. Southern Bell Tel. &c. Co.*, 172 Ga. App. 26, 27 (2) (322 SE2d 76) (1984).

Chest Pain Standing Orders, to ensure that the physicians and nurses were adequately informed of and knowledgeable about them. Hence, under *Gray*, 217 Ga. App. at 874 (1), Dr. Herrington owed a legal duty to the decedent to provide that specific type of supervision over emergency room physicians and nurses.

In seeking summary judgment, Dr. Herrington argued that, in the absence of a physician-patient relationship, he could be found to owe a legal duty to the decedent through his assumption of the role of Medical Director only if the plaintiff proved that the decedent was a third-party beneficiary of the Medical Director Agreement. To support his argument, Dr. Herrington relied on *Anderson v. Houser*, 240 Ga. App. 613, 615-621 (1) (523 SE2d 342) (1999). But *Anderson* is distinguishable from the present case and should not be construed as broadly as Dr. Herrington argued.

First, *Anderson* involved a situation where the defendant was simply an on-call physician at a hospital emergency room; it did not involve a physician who had assumed specific supervisory responsibilities over other emergency room staff. In the latter situation, the case of *Gray*, 217 Ga. App. at 874 (1), is controlling rather than the case of *Anderson*.

Second, irrespective of whether a third-party beneficiary relationship exists, it is a longstanding principle in tort actions that

13

[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Huggins v. Aetna Cas. & Surety Co.*, 245 Ga. 248, 249 (264 SE2d 191) (1980). See Restatement (Second) of Torts § 324A. See also *Urban Svcs. Group v. Royal Group*, 295 Ga. App. 350, 351-353 (1) (671 SE2d 838) (2008).

By agreeing to take on specific supervisory responsibilities over the emergency room staff with respect to their training, Dr. Herrington undertook to render services which he should have recognized as necessary for the protection of emergency room patients. Moreover, the alleged failure to exercise reasonable care in rendering those services would increase the risk of harm to emergency room patients, given that the failure to have physicians and nurses properly trained on hospital protocols and standing orders would increase the risk to patients of receiving negligent medical care. Accordingly, irrespective of whether a third-party beneficiary relationship

14

existed based on the Medical Director Agreement, Dr. Herrington assumed a duty to the decedent under the principle enunciated in *Huggins* and Section § 324A. Dr. Herrington's reliance on *Anderson*, therefore, was misplaced.[5]

For these combined reasons, the trial court erred in concluding that Dr. Herrington owed no legal duty to the decedent and thus in granting summary judgment in favor of him on the plaintiff's claim for professional negligence. In reversing the grant of summary judgment, we emphasize that our decision should not be read as holding that a physician, simply by assuming the role of medical director of a hospital department, assumes a legal duty of general supervision over the staff of that department, the breach of which he or she can be held liable to a patient. Rather, the instant case involves a more narrow duty of supervision over the training of department staff arising out of the specific language of the Medical Director Agreement and Dr. Herrington's deposition testimony regarding his role in the

[5] *Schrader v. Kohout*, 239 Ga. App. 134 (522 SE2d 19) (1999) also is distinguishable from the present case. In *Schrader*, the defendant-psychologist provided consultative services to the psychologist who treated the plaintiff-patient. Id. at 135-136. We held that because the defendant did not have a physician-patient relationship with the plaintiff, she could not be held liable for malpractice resulting from the alleged negligent psychological care received by the plaintiff. Id. at 136-138. But we specifically pointed out that the defendant "provided direct, undisputed, unequivocal evidence" that she did not serve as a supervisor over the treating psychologist. Id. at 136.

15

Emergency Department. Furthermore, we express no opinion as to whether the plaintiff ultimately will be able to establish the other necessary elements of a professional negligence claim, including the element of causation.

2. The plaintiff also challenges the trial court's order granting summary judgment to Dr. Herrington on the ordinary negligence claim. In seeking summary judgment on that claim, Dr. Herrington asserted that the uncontroverted evidence showed that his supervisory duties as Medical Director involved medical questions demanding the exercise of professional judgment and skill, such that the claim brought against him for breach of those duties could not be construed as one for ordinary negligence. We agree with Dr. Herrington.

Whether a plaintiff's claim sounds in ordinary or professional negligence is a question of law for the court to resolve. *James v. Hosp. Auth. of the City of Bainbridge*, 278 Ga. App. 657, 659 (1) (629 SE2d 472) (2006). Whether a claim is for ordinary or professional negligence "depends on whether the conduct, even if supervisory or administrative, involved a medical judgment." (Citation and punctuation omitted.) Id.

Here, the plaintiff relied upon the same allegations supporting the claim for professional negligence against Dr. Herrington to support the claim for ordinary

16

negligence. The Chest Pain Standard Orders at the center of those allegations were contained on a single sheet of paper and simply listed the following measures without elaboration:

EKG

PORTABLE CHEST XRAY

CBC, CMP, CARDIAC ENZYMES

SALINE LOCK

02 2-4L NC

CARDIAC MONITOR

OLD CHART

As such, the question of how the Chest Pain Standing Orders should specifically be implemented in the emergency room, and thus of how to properly and effectively train emergency room staff on how to implement the standing orders, required the exercise of medical knowledge and judgment. For example, there is nothing in the written Chest Pain Standing Orders describing how soon the EKG should be performed when a patient presents in the emergency room with chest pain; deciding the window of

17

time within which the EKG should be performed,[6] and ensuring that staff were trained accordingly, would involve an exercise of professional medical (rather than simply administrative) skill and expertise.

For these reasons, the allegations asserted against Dr. Herrington for allegedly failing to properly supervise the training of emergency room staff on the Chest Pain Standing Orders sounded solely in professional rather than ordinary negligence. See *Stafford-Fox v. Jenkins*, 282 Ga. App. 667, 670-671 (2) (639 SE2d 610) (2006) (claim that physician negligently failed to implement appropriate procedures in his office to ensure that lab results were properly acted upon was claim in professional rather than ordinary negligence); *Upson County Hosp. v. Head*, 246 Ga. App. 386, 392 (1) (540 SE2d 626) (2000) (patient's "claim that the hospital either failed to follow established anesthesia procedures or protocols or failed to have any established procedures or protocols in place is a claim for professional negligence"). The trial court thus committed no error in granting summary judgment in favor of Dr. Herrington on the plaintiff's ordinary negligence claim.

---

[6] As previously noted, Dr. Herrington testified that the goal was to have the EKG performed within 10 minutes of a patient presenting in the emergency room with complaints of chest pain.

*Judgment affirmed in part; reversed in part. Adams and McFadden, JJ., concur.*